W A G E, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31630. Promulgated November 18, 1952.

250

*Benjamin Alpert, Esq.*, for the petitioner.
*Robert J. McDonough, Esq.*, for the respondent.

OPINION.

RICE, *Judge:* On the first issue, respondent argues that petitioner is not entitled to use the unused excess profits credit of Revoir for the years 1942 and 1943 because (1) petitioner is not the "taxpayer" as contemplated by section 710 (c) (3) (B) of the Code;[1] and (2) the merger of Sentinel into petitioner had no business purpose and was primarily a tax avoidance scheme which runs afoul of section 129 of the Code.[2]

With respect to the first argument made by respondent, our findings of fact show that the name of Revoir Motors, Inc., was changed on August 31, 1943, to W A G E, Inc., the petitioner. It continued in the automobile business until sometime in December of that year, at which time it discontinued the automobile business, selling its inventory to Frank G. Revoir, and thereafter engaged only in the radio broadcasting business. On such facts, we believe our holding in *Alprosa Watch Corporation,* 11 T. C. 240 (1948), is controlling and that petitioner and Revoir Motors, Inc., constitute for Federal tax purposes one and the same taxpayer. In that case the Esspi Glove Corporation was engaged in the business of manufacturing and selling gloves until June 15, 1943. On that date, all of the stock of Esspi was purchased by two new stockholders, its name was changed to the Alprosa Watch Corporation, its place of business was moved, and the nature of the business was changed to the buying and selling of jewelry. We held that the petitioner, Alprosa Watch Corporation, and the Esspi Glove Corporation constituted one and the same tax entity, and that the income and expenses of the glove business for the period July 1, 1942, through June 14, 1943, the net operating losses of that business for a prior taxable year ended April 30, 1942, and the unused excess profits credits of Esspi from prior years, could be included by peti-

---

[1] SEC. 710. IMPOSITION OF TAX.

(c) UNUSED EXCESS PROFITS CREDIT ADJUSTMENT.—

\* \* \* \* \* \* \*

(B) UNUSED EXCESS PROFITS CREDIT CARRY-OVER.—If for any taxable year beginning after December 31, 1939, the taxpayer has an unused excess profits credit, such unused excess profits credit shall be an unused excess profits credit carry-over for each of the two succeeding taxable years, \* \* \*.

[2] SEC. 129. ACQUISITIONS MADE TO EVADE OR AVOID INCOME OR EXCESS PROFITS TAX.

(a) DISALLOWANCE OF DEDUCTION, CREDIT, OR ALLOWANCE.—If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, \* \* \* and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. \* \* \*

tioner in computing its excess profits credit for the taxable year ended June 30, 1943. See also *A. B. & Container Corporation*, 14 T. C. 842 (1950).

Respondent says, in support of his second argument, that Sentinel began operations in April of 1941 with a 1-kilowatt station; that it was immediately apparent that an increase to 5 kilowatts was advisable; that an application was made to the Commission for such an increase; but that it was not until August 1943, more than two years after the date of the application and in the midst of a global war when there was no expectation of getting any sort of electronics equipment in the then foreseeable future, that the reorganization took place. He goes on to state that this, coupled with the fact that by August 1943, Revoir Motors, Inc., was practically out of business due to inability to get automobiles or help, and was therefore unlikely to be able to use its excess profits credit carry-over, necessitates the conclusion that the primary purpose of the merger was to make use of the credit.

The question to be decided is essentially one of fact, necessitating an interpretation of section 129 of the Code. Our findings show that when Sentinel was originally incorporated in 1937, $75,000 cash was paid in for its stock. It was issued a license for a 1-kilowatt station in April 1941. Approximately $110,000 had been expended by that time for the construction of the facilities and for expenditures in connection with obtaining the license from the Commission. Frank G. Revoir had obtained a loan of $50,000 for Sentinel with his personal endorsement thereon. Immediately after the issuance of the license in 1941, the officers of Sentinel felt it would be necessary, in order to be in a competitive position, to increase the power of the station to 5 kilowatts. They also believed that FM would supplant AM broadcasting, or at least be its equal, and that they would have to construct an FM transmitter for the same competitive reasons. They also believed that it might be necessary sometime in the future to be prepared to engage in television transmission. Each of these three projects required considerable cash outlay which Sentinel did not have.

At August 31, 1943, the net worth of Sentinel was approximately $100,000, of which about $64,000 was invested in broadcasting facilities and about $8,000 represented the amortized cost of its franchise, so that about $72,000 of its total net worth was invested in nonliquid assets. At the same date the balance sheet of petitioner showed the following approximate amounts: cash, $365,000; accounts receivable, $26,000; inventory, $10,000; United States Government bonds, $25,000; notes receivable, $150,000. Against these, there was a total liability of about $79,000. Thus, the merger of Sentinel into W A G E, Inc., made available for the radio broadcasting business large liquid assets.

We are not unmindful that the unused excess profits credit carry-over is one of the few exceptions to the annual accounting period and

that its use is designed to mitigate some of the rigors of the accounting period and bring it into harmony with actualities; and that the underlying principle of carry-overs and carry-backs is one of averaging positive and negative income from the business of a taxpayer over a period of years.[3] However, section 129 was not enacted to disallow all deductions, credits, or other allowances where control of a corporation was acquired after October 8, 1940. The legislative history of section 129 has been analyzed by this Court in *Commodores Point Terminal Corporation*, 11 T. C. 411·(1948), where we said at page 417:

* * * This section [129] condemns tax avoidance only when there is acquisition of control and the employment of that control for the principal purpose of avoiding or evading tax, the acquiring person thereby securing the benefit of a deduction, credit, or allowance "which such person or corporation would not otherwise enjoy."

On the basis of this record, it cannot be said that the principal purpose of the merger of Sentinel into petitioner was to avoid or evade taxes because the facts clearly show that a substantial business purpose was achieved. We, therefore, hold for petitioner on this issue.

With respect to the second issue (whether petitioner is entitled, in computing its invested capital credit for 1944 and 1945, to a credit for new capital by reason of the acquisition of the stock of Sentinel in exchange for which petitioner issued its own stock), the respondent argues that in a fact situation such as we have here the avowed "business purpose" of petitioner was the acquisition of the operating assets of Sentinel and not merely its stock; that the transaction was, in fact, a transaction between the two corporations; and that, therefore, the individual steps must be ignored and the single transaction rule applied.

Section 718 of the Code defines "equity invested capital" as including money or property paid in for stock. Section 718 (a) (6) allows an addition to the amount includible on account of invested capital of 25 per cent of "new capital" paid in during a taxable year beginning after December 31, 1940, subject to certain limitations contained in section 718 (a) (6) (A).[4] As shown in our findings, the stockholders

---

[3] See Raum, Carry-overs and Carry-backs in Connection with the Liquidation or Sale of a Business, 49 Col. L. R. 49 (1949).

[4] SEC. 718. EQUITY INVESTED CAPITAL.

(a) DEFINITION.

* * * * * * *

(6) NEW CAPITAL.

* * * * * * *

(A) There shall not be included money or property paid in by a corporation in an exchange to which section 112 (b) (3), (4), (5), or (10), or so much of section 112 (c), (d), or (e) as refers to section 112 (b) (3), (4), (5), or (10) is applicable (or would be applicable *except for section 371 (g)*), or would have been applicable if the term "control" had been defined in section 112 (h) to mean the ownership of stock possessing more than 50 per centum of the total combined voting power of all classes of stock entitled to vote or more than 50 per centum of the total value of shares of all classes of stock.

of Sentinel transferred their stock to petitioner in exchange for which petitioner issued 6,000 shares of its common stock. After the merger was completed, Sentinel was dissolved.

The petitioner argues that it does not come within the limitations imposed by section 718 (a) (6) (A) because that subparagraph deals with transactions in which money or property is paid in by a corporation, and that here we have property (the stock of Sentinel) paid in by individuals, and not a corporation.

We have held under the first issue that petitioner had a business purpose in acquiring Sentinel, and on this record it seems clear to us that it desired and intended to acquire all of the assets of Sentinel in order to carry out that business purpose. In fact, petitioner's argument on the first issue tends to fortify that conclusion. Even before Sentinel was dissolved, petitioner had requested the Commission to transfer the broadcasting license from Sentinel to petitioner. The letter which accompanied the application to the Commission stated that the president of petitioner was of the opinion that it would be in the public interest for Sentinel to transfer its broadcasting license to petitioner and thus acquire the capital necessary to improve and expand the services rendered by station W A G E. The letter also stated that it was the desire of petitioner to devote its capital to the expansion and improvement of broadcasting services, and it recited the substance of the agreement of August 31, 1943, to merge Sentinel into petitioner conditioned upon approval thereof by the Commission.

We agree with and hold for the respondent on this issue that the whole transaction was a single, indivisible transaction. Cf. *American Wire Fabrics Corporation*, 16 T. C. 607 (1951); *Kimbell-Diamond Milling Co.*, 14 T. C. 74 (1950), affd. (C. A. 5, 1951) 187 F. 2d 718, certiorari denied 342 U. S. 827 (1951). Here the ultimate effect of the transaction was an exchange of stock for property and, therefore, was a reorganization within the purview of section 112 (b) (4).[5] It must, therefore, follow that since it was an exchange to which section 112 (b) (4) applies, and since under the single transaction rule it was property paid in by a corporation, the limitations of section 718 (a) (6) (A) apply.

With respect to the third issue (whether petitioner, in computing its excess profits tax liability for the year 1943, erroneously included the income of Sentinel from September 1 through December 31, 1943), the respondent argues (1) that there was a *de facto* merger on Sep-

---

[5] SEC. 112. RECOGNITION OF GAIN OR LOSS.

  (b) EXCHANGES SOLELY IN KIND.—

  \*       \*       \*       \*       \*       \*       \*

    (4) SAME—GAIN OF CORPORATION.—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

tember 1, 1943, and therefore the income belonged to petitioner, and (2) that the petitioner was entitled to the income as a result of the contractual arrangement between the parties. He points out that, even though the certificate of merger was not filed until December 30, 1943, the merger was completed for all practical purposes by September 1, 1943; that there was no foreseeable obstacle to the plan of reorganization once it was undertaken; that the reorganization involved the same stockholders who were going to strengthen the financial aspect of the broadcasting enterprise, and it is therefore difficult to conceive of any objection that the Commission might raise; and that the entire transaction was controlled by Frank G. Revoir and there was small chance of his backing out since the operation was obviously the result of considerable prior planning.

Our findings of fact show that the agreement entered into on August 31, 1943, provided that it would be subject to petitioner's receiving permission, authority, and approval from the Commission to operate a broadcasting station; and that if such permission, authority, and approval were not finally obtained, the agreement was to be null and void. Our findings also show that Sentinel was dissolved on the effective date of the merger when the certificate was filed with the Secretary of State of New York on December 30, 1943. We think this issue is controlled by our decision in *Vallejo Bus Co.*, 10 T. C. 131 (1948), affd. (C. A. 9, 1948) 171 F. 2d 747. In that case, the stockholders of a California corporation took over the corporation's business and assets on June 1, 1942, under a contract of purchase and sale. They continued the business as copartners. The contract provided that the sale was to be effective as of June 1, 1942, but that the sale was subject to the approval of the Railroad Commission of the State of California and, in the event such approval was not forthcoming, the agreement was to be null and void and of no effect. The approval of the Railroad Commission was not obtained until September 15, 1942, and the question before this Court was the taxability of the profits derived from the operation of the bus lines from June 1 to September 15, 1942. The respondent contended that the profits were taxable to the corporation and not to the successor partnership. The Court held for the respondent on the ground that the sale had not been completed prior to September 15, 1942, and that the profit earned during that period belonged to the corporation and was taxable to it. Cf. *Portland Furniture Manufacturing Co.*, 30 B. T. A. 878 (1934). We therefore hold for petitioner on this issue.

At the hearing of this proceeding, the petitioner moved to amend its petition to allege the inclusion of the above discussed income in its 1943 return. There was some colloquy between counsel as to whether respondent would object to the amendment. Respondent's counsel stated:

Now, as to this other issue, whether the income of Sentinel Broadcasting was improperly included in the returns of Wage, Inc., for 1943, I am not prepared to offer any evidence and rebut it because I wasn't informed of the issue until this morning. Now, my understanding is that if the petitioner won that point in the case, that that could be settled under a Rule 50 computation.

Petitioner's counsel stated at this point in the proceeding:

And I have no objection, in fact, I said I would rather leave it to a Rule 50 computation, because the computation could be made as to the amount of income if it was decided we were correct in our first premise, and if we were wrong, then there would be no need to make any computation. But it could be determined under Rule 50, and we would therefore not burden the Court with proof on it, but submit it, and I don't think we have any problem here.

Respondent, subsequently, in its amended answer denied petitioner's allegation relating to the inclusion of the above discussed income. This would seem to be an apparent oversight, and not in accord with the agreement between counsel, and should be taken into consideration in a computation under Rule 50.

*Decision will be entered under Rule 50.*