VIRGINIA METAL PRODUCTS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74959.   Filed January 29, 1960.

*James A. Cuddihy, Esq.*, for the petitioner.
*Charles B. Norris, Esq.*, for the respondent.

ARUNDELL, *Judge:* Respondent determined a deficiency in income and excess profits taxes for the taxable period January 1, 1952, to December 15, 1952, in the amount of $200,967.04.

After concessions by both parties, three issues remain for our determination, as follows:

1. Are Virginia Metal Products Corporation and its affiliated companies entitled to a deduction in a consolidated return for an alleged loss from the sale of the assets and business of a corporation whose stock Virginia acquired on September 1, 1951?

2. Is the net operating loss of a corporation whose stock was acquired on September 1, 1951, by Virginia Metal Products Corporation available as a net operating loss carryover deduction to the affiliated group in a consolidated return for 1952? Alternatively, were profits of Virginia Metal Products Corporation merely shifted to the corporation whose stock was acquired, thereby necessitating an allocation under either section 22(a), 45, or 129(b) of the In-

ternal Revenue Code of 1939 of profits between those corporations in order correctly to reflect the taxable net income of the affiliated group?

3. Is Virginia Metal Products Corporation liable for excess profits tax during the taxable period in question?

### FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

Petitioner's predecessor, Virginia Metal Products Corporation (hereinafter sometimes called Virginia), and its subsidiaries filed a consolidated income tax return for the period January 1, 1952, through December 15, 1952, with the office of the district director of internal revenue at Newark, New Jersey, on April 17, 1953.

Virginia maintained its books and records on an accrual basis of accounting.

Virginia resulted from the original incorporation of Snead and Company under the laws of the State of New Jersey on July 28, 1900. Snead and Company was organized for the purpose of manufacturing iron and steel products. Snead and Company specialized in the manufacture and installation of library furnishings and shelving. For example, Snead and Company made installations in the Vatican in Rome, the Imperial Palace in Tokyo, and the Congressional Library in Washington, D.C. In 1946, the name Snead and Company was changed to Virginia.

On December 16, 1952, over 95 per cent of the stock of Virginia was acquired by an Ohio corporation, and in 1953 Virginia's name was changed twice, the last name being Virginia Metal Products, Inc., which is the petitioner herein.

Arlite Industries, Inc. (hereinafter sometimes called Arlite), resulted from a merger on April 1, 1950, between the New Jersey Stoker Corporation and Insulight Company, Inc.

The New Jersey Stoker Corporation was organized in New Jersey on September 26, 1929, to sell and service automatic furnace stokers.

The Insulight Company, Inc., was granted a charter in New Jersey on September 29, 1947, and was organized to carry on as a corporation the business of a prior partnership engaged in the manufacture of aluminum storm windows and doors.

Upon the merger of the New Jersey Stoker Corporation and Insulight Company, Inc., the name was changed to Arlite Industries, Inc.

As of September 1, 1951, Virginia acquired all of the capital stock of Arlite in exchange for 5,000 shares of $2-par-value stock of Virginia.

On January 31, 1952, the name of Arlite was changed to Winfield Construction Corporation (hereinafter sometimes called Winfield).

During the period at issue, Virginia was engaged in the business of manufacturing steel products, principally steel doors, door frames, office and laboratory partitions and doors, and library shelves.

The president of Virginia, Joseph A. Patrick, at a meeting held on December 20, 1951, in New York, New York, stated that the operations at Arlite since its acquisition by Virginia had been most discouraging and that the recent rulings of the National Production Authority with regard to the cutback in allocations of aluminum rendered the continued operation of the window business virtually impossible. He also stated that the results of operations as well as the outlook for the immediate future of the stoker division were also disappointing. He then recommended that the board consider the advisability of effecting the sale of its stock in Arlite or the business of Arlite at the earliest opportunity. After a full discussion, the board resolved that the president and treasurer of Virginia be authorized and directed to sell the stock or business of Arlite on the best possible terms at the earliest possible moment.

Under date of January 2, 1952, Arlite sold all of its assets and business to Charles F. Reuter and Company, Inc., a New York corporation (hereinafter sometimes called Reuter).

Paragraphs 6 and 7 of the sale agreement of January 2, 1952, are as follows:

6. That there is excluded from the said sale the corporate structure of Arlite and the corporate shares of stock issued by Arlite to its respective stockholders; it being the intention of Arlite to retain its corporate identity and stock structure and to continue in a line of business independent of that formerly operated by it and sold as aforesaid by it to Reuter.

7. Arlite further covenants and agrees that promptly after January 2, 1952, it will change its name to one which will not contain the word "Arlite", and thereafter will refrain from using any name containing the word "Arlite".

Subsequent to the sale of the assets and business of Arlite to Reuter, a dispute arose as to the value of the assets transferred. By letter dated April 23, 1952, the president of Reuter, Charles F. Reuter, set forth his position in regard to the dispute. Among other things, he stated that "[t]he basis and the intent of the agreement [of January 2, 1952] was to the effect that the assets to be transferred were to be at their real values with all the water extracted from them." The letter continued in part as follows:

After the consummation of the transaction * * *, it was discovered that many of the assets were substantially overvalued. In support of the purchase price requested by Virginia Metal Products Corporation a statement was submitted from the company's auditors, Puder & Puder, certified public accountants. It is our opinion that this report is shamefully incorrect. No investigation apparently was made of the accounts receivable. The inventory of the Iron Fireman

Division was valued at replacement cost instead of cost or market, whichever was lower. This inventory included many surplus items and obsolete items as well as items that had no inventory value. The window division also contained items priced at cost which had been in inventory for a year and a half with absolutely no provision for their current use.

In addition to the inventory and receivable items the company was engaged in smelting scrap aluminum. The smelting department was not a practical operation. Besides, there were no figures available to show the cost of operating the smelting plant. From what we could gather the costs were very excessive and resulted in a high cost for aluminum extrusions. Therefore, the plant has since been dismantled.

There was also included in the inventory certain supplies for the smelting division * * * amounting to $2,518.49. These items consisted of miscellaneous supplies * * * which are of no use in the current operations of the plant.

We were led to believe that the company had sufficient orders on hand to continue full scale operations and that the only preventative from continuing such full scale operations was the lack of aluminum. It was found that the company had orders on hand which represented old orders, but there were no current orders and orders were not currently being received because of the lack of an adequate distribution system.

It is extremely difficult at this time to re-price all the items involved in this transaction. It is, however, very evident that the accounts receivable were substantially over-valued and that the inventory of the Iron Fireman parts was likewise valued on a basis entirely contrary to the agreement. It is our contention that the assets delivered to Charles F. Reuter & Co., Inc. were over-valued at least $34,048.11 * * *

At a conference with Patrick at which the aforesaid points were raised by Reuter, Patrick contended that neither Virginia nor Arlite had guaranteed the accounts receivable, that the sale was over, and there was nothing for him to discuss.

Reuter said he felt that he had been imposed upon and that he was going to sue if some adjustment was not made.

Patrick then discussed the matter with David G. Baird, the then chairman of the board of Virginia. Baird felt that neither he nor Patrick nor Virginia could afford to be sued on a charge of having used bad faith.

After a further discussion with Reuter, the latter agreed to settle his claim that the assets sold to Reuter had been "over-valued" by accepting $24,968.16 as the amount of the overvaluation instead of the amount of $34,048.11 claimed in his letter to Patrick.

By voucher dated on or about April 22, 1952, Winfield thereupon settled the dispute between Reuter and the predecessor to Winfield by the payment of $24,968.16 to Reuter and received a general release from Reuter of even date.

### Facts in re Issue 2.

At the time of the acquisition of the stock of Arlite by Virginia, Baird, or organizations controlled by him, controlled approximately

75 per cent of Virginia, and Patrick indirectly controlled approxi-mately the other 25 per cent.

In 1951, at the suggestion of Baird, Patrick caused two examinations to be made of Arlite.

Since Virginia was in the steel partitions business, Patrick believed that if Virginia further acquired a line of aluminum for windows to supplement Virginia's steel products, Virginia might be able to expand this line as it went along with the general contractors. He believed, in the future, that in the case of business construction, e.g., office buildings, Virginia would be able to give more than the steel office partitions and could also give outside walls as Virginia gained experience in the fabrication of aluminum. The treasurer of Virginia, George W. Knox, believed that the acquisition would be an excellent means of getting into the aluminum window and aluminum partition business.

Patrick was aware that Arlite had lost money but believed it was because of unbusinesslike practices and a lackadaisical approach to sales, and that with the manufacturing, supervisory staff, and sales force of Virginia the bad practices could be overcome.

Knox went to the Arlite plant and made an examination of the facilities and reported to Patrick that the company was completely bankrupt, that the facilities were poor, and that it would take a lot of hard work to put it back into shape. However, he thought it was an excellent means of getting into the aluminum window business, and he could see a future in aluminum partitions. Knox was informed that aluminum would be made available to Arlite after the purchase of the stock of that corporation. In deciding to purchase the stock of Arlite, Patrick relied on his own investigations and also on the examinations made by Knox and the engineers of Virginia.

After the purchase of the stock of Arlite, Patrick loaned $25,000 in cash to Arlite and took a note in exchange, and Baird loaned $75,000 in cash to Arlite.

After the purchase of the stock of Arlite, Knox appeared before the War Production Board in New Jersey on three occasions and on four occasions before the War Production Board in Washington, D.C., to file applications for aluminum and was turned down on all occasions because of the Korean war crisis.

The iron stoker division of Arlite was in operation at the time of the acquisition by Virginia of that company's stock but attempts were made to sell it immediately after the acquisition.

The Government forced Arlite to close down its smelting unit after December 1, 1951, so that the Government could get complete control of scrap as well as free aluminum.

Staff members of Virginia, i.e., treasurer, factory superintendent, factory engineer, and steel expediter, spent large amounts of their time at the Arlite plant in New Jersey attempting to make it profitable. However, toward the end of the year 1951 too much time was being spent by the personnel of Virginia with Arlite and, because the problems were more serious than anticipated, they questioned whether or not it was wise to continue. On January 2, 1952, the assets and business of Arlite were sold to Reuter as previously found herein.

At the time of the acquisition of the stock of Arlite, Arlite had about 40 employees of whom about 20 worked in the Iron Fireman division. During the period September 1, 1951, to January 2, 1952, these employees remained with Arlite as did the president of that corporation. From the period January 2, 1952, through January 31, 1952, there was no change in the corporate structure of Arlite, but all assets and all liabilities had been disposed of and Arlite had no employees during this period. The employees of Arlite became employees of Reuter.

For 2 years prior to January 1952 the officers of Virginia had been discussing forming a separate erection subsidiary to erect the products of Virginia rather than to perform the erection itself. All of the four or five major competitors of Virginia had separate erection companies. The officers of Virginia believed that the erection part of its business could be operated much more efficiently by a separate corporation.

On February 1, 1952, all the erection business, including the erection tools, of Virginia was transferred to Winfield. On and after that date all of Virginia's construction personnel were transferred to and became employees of Winfield. Erection funds at jobsites were changed over to new accounts in the name of Winfield. Winfield had a separate payroll and all employees of Winfield were paid by Winfield.

A separate budgeting department was set up by Virginia for Winfield and each erection job was analyzed as to the footage and type of partition involved. A standard dollar allowance per foot was given for each type of partition; in addition, there were standard allowances for doors and the installation of glass before a total of the budget was arrived at. Each job was considered separately. On several occasions it was necessary to make adjustments in the price of certain jobs that Winfield had performed for Virginia. Letters would be addressed and a request would be made from Winfield to Virginia, and detailed reasons would be set forth why it was believed an adjustment was necessary. The total amount paid by Virginia to Winfield for conducting the erection part of the business formerly conducted by Virginia was $1,143,043.84.

For the period from January 1, 1952, to December 15, 1952, a consolidated Federal income tax return was filed by Virginia and its subsidiaries, including Winfield and a company called Snead, Inc.[1] In that return a consolidated net income of $188,781.44 was reported. The details of that amount were set forth in a "Schedule" attached to the return, which schedule is summarized as follows:

| | Virginia | Winfield | Snead, Inc. |
|---|---|---|---|
| Sales | $5, 886, 783. 32 | $1, 143, 043. 84 | |
| Cost | 4, 592, 225. 98 | 881, 830. 24 | |
| Gross profit | 1, 294, 557. 34 | 261, 213. 60 | |
| Other income | 14, 021. 15 | 150. 56 | $27, 000. 00 |
| | 1, 308, 578. 49 | 261, 364. 16 | 27, 000. 00 |
| Deductions | 1, 151, 005. 11 | [1] 84, 500. 61 | 3, 612. 28 |
| Net income | 157, 573. 38 | 176, 863. 55 | 23, 387. 72 |
| Less 16/366 for last 16 days of December | 6, 889. 01 | 7, 732. 14 | 1, 021. 46 |
| Net income before net loss carryover | 150, 684. 37 | 169, 131. 41 | 22, 366. 26 |
| Less net loss carryover of Winfield: | | | |
| Year ended 12-31-50 ___ $72, 346. 20 | | | |
| 8 mo. ended 8-31-51 ___ $81, 054. 40 | | 153, 400. 60 | |
| Net income | 150, 684. 37 | 15, 730. 81 | 22, 366. 26 |
| Consolidated net income of Virginia, Winfield, and Snead, Inc | | | 188, 781. 44 |

[1] Included in this item was loss on sale of assets, $28,694.

The respondent in his determination of the deficiency increased the consolidated net income as reported by 5 items totaling $237,483.26, as follows:

Unallowable deductions and additional income:
(a) Bad debts _____ $28,210.38
(b) State income tax _____ 3,569.27
(c) Indebtedness discharged or forgiven _____ 24,863.39
(d) Loss on sale of assets to Reuter _____ 27,439.62
(e) Income increased _____ 153,400.60

237,483.26

Adjustments (a), (b), and (c) are no longer at issue. In a statement attached to the deficiency notice, the respondent explained adjustments (d) and (e) as follows:

(d) The deduction claimed for an alleged loss of $27,439.62 [$28,694 minus 16/366 of $28,694], on the sale of Winfield Construction Corporation's assets to Charles F. Reuter & Co., Inc., has been disallowed because it has not been shown that a loss was realized.

(e) It has been determined that the acquisition by Virginia Metal Products Corporation of Winfield Construction Corporation (formerly Arlite Industries, Inc.) served no business purpose. It has also been determined that the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of deductions which otherwise it would not enjoy. Accordingly, the deduction of $153,400.60, repre-

[1] Not to be confused with Snead and Company.

senting losses of Winfield Construction Corporation (formerly Arlite Industries, Inc.) prior to its acquisition by Virginia Metal Products Corporation, has been disallowed. Section 129, Internal Revenue Code of 1939.

Alternatively, and further, to prevent the common control of these corporations from being used to reduce, avoid or escape taxes, gross income of Winfield Construction Corporation (formerly Arlite Industries, Inc.) for its taxable year January 1, 1952 to December 15, 1952 has been allocated to Virginia Metal Products Corporation in the amount of $153,400.60 in accordance with the provisions of sections 45, 129(b) and 22(a) of the Internal Revenue Code of 1939.

During the period September 1, 1951, to December 31, 1951, Arlite wrote off losses of $85,252.35 which were included in the consolidated return of Virginia for that period, not here involved.

Neither Virginia nor Winfield sustained a loss from the sale of the assets and business of Arlite which was deductible on the consolidated return for the taxable period ending December 15, 1952.

The acquisition by Virginia of all the stock of Arlite was made for a bona fide business purpose, and not principally for the interdicted purpose mentioned in section 129 of the Internal Revenue Code of 1939.

During the period here at issue, the dealings between Virginia and its subsidiary Winfield were at all times at arm's length.

OPINION.

*Issue 1.*—There was deducted on the consolidated return by the subsidiary Winfield the net amount of $27,439.62 ($28,694 minus $^{16}\!\!/_{366}$ of $28,694) as a "Loss on sale of assets" to Reuter. The respondent disallowed the claimed deduction and gave as his reason that "it has not been shown that a loss was realized." The record does not show how Winfield arrived at the amount of $28,694. Nowhere in the record is it shown what the selling price of the assets was or the adjusted basis [2] for determining gain or loss. The sale agreement merely states that "in consideration of the sum of $1.00 by each of the parties to the other in hand paid and other good and valuable considerations" the parties agree to sell and to purchase, etc. Petitioner limited its proof to showing that several months after the sale had taken place, Reuter made claim against Winfield that the assets sold were grossly misrepresented and "were over-valued at least $34,048.11" and that in order to avoid a lawsuit, Winfield settled the dispute by the payment to Reuter of $24,968.16, and obtained from Reuter a general release. It seems to us that the most that could be said for such proof would be that it shows that the selling price (whatever that amount was) should be reduced by the $24,968.16 paid back to Reuter. It still would leave the gain or

[2] See sec. 113, I.R.C. 1939.

loss from the sale to Reuter as unproven. Apparently, as indicated in its brief, the petitioner is contending that in refunding the $24,968.16 to Reuter, Winfield settled a dispute to protect its reputation and that of its officers and that, in so doing, it incurred an ordinary and necessary business expense deductible under section 23 of the 1939 Code.

For reasons given above, we do not think the refunding of the $24,968.16 can be disassociated from the sale of the assets and business made on January 2, 1952. The deduction taken on the return was for a "'Loss on sale of assets" to Reuter. Reuter claimed that the sales price was overvalued to the extent of $34,048.11 and agreed to accept $24,968.16 in full settlement of his claim. We hold that petitioner has failed to show error on the part of the respondent in disallowing the "Loss on sale of assets" claimed by Winfield on the consolidated return.

*Issue 2.*—Respondent determined that the acquisition by Virginia on September 1, 1951, of all the stock of Arlite served no business purpose and that the "principal purpose" for which such acquisition was made was to secure the benefit in a consolidated return for the period January 1 to December 15, 1952, of the net operating losses of Arlite for the 20-month period ending August 31, 1951, in the amount of $153,400.60. He contends that Virginia should be denied that benefit under section 129(a) of the Internal Revenue Code of 1939.[3]

Section 3797(a) of the 1939 Code defines the term "person" to mean and include a "corporation."

On the other hand, petitioner contends that section 129 has no conceivable application to the facts of this case for the reason that the section is directed only against an "acquiring" corporation and has no effect whatever upon the corporation that is acquired. In this connection petitioner argues that although a consolidated return was filed for the period here in question, each of the corporations contained in the affiliated group retained its own separate corporate identity; that in this consolidated return Virginia itself is not claiming the benefit of the net operating losses of Arlite; but that Winfield[4] alone is claiming the benefit of such net operating

---

[3] SEC. 129. ACQUISITIONS MADE TO EVADE OR AVOID INCOME OR EXCESS PROFITS TAX.

(a) DISALLOWANCE OF DEDUCTION, CREDIT, OR ALLOWANCE.—If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * *

[4] The name of Arlite was later changed to Winfield Construction Corporation.

losses against its own net income of $169,131.41 under section 122(b) (2)(B) of the 1939 Code.[5]

We have consistently held that section 129(a) applies only to an acquiring corporation and does not apply to an acquired corporation. *Alprosa Watch Corporation*, 11 T.C. 240, 245; *T.V.D. Co.*, 27 T.C. 879, 886; *British Motor Car Distributors, Ltd.*, 31 T.C. 437, 440 on appeal (C.A. 9). Here, the acquired corporation is Winfield (formerly Arlite). It alone is seeking the benefit of its own net operating loss carryover against its own net income and, under the decisions just cited, it would not be governed by section 129(a). However, even were we to assume that since both Virginia and Winfield are included in a consolidated return for the period here at issue, and that by reason of such consolidated return Virginia might be said to obtain some possible benefit from the allowance of the net operating loss of Winfield, we do not think that the obtaining of such possible benefit was the principal purpose of Virginia in acquiring the control of Arlite. Whether the acquisition of control of a corporation is for the interdicted purpose mentioned in section 129(a) presents a question which is purely factual. *Elko Realty Co. v. Commissioner*, 260 F. 2d 949 (C.A. 3, 1958), affirming per curiam our Opinion at 29 T.C. 1012.

The evidence in this case is to the effect that the acquisition of the stock of Arlite was for a bona fide business purpose. Both Patrick and Knox testified at great length that they believed the acquisition of the stock of Arlite would be an excellent means of getting into the aluminum window and aluminum partition business. They were aware of the losses that Arlite had suffered but believed it was because of the unbusinesslike methods employed by Arlite. Patrick and Knox believed that with the manufacturing, supervisory staff, and sales force of Virginia all of these unbusinesslike methods could be overcome and that the operations of Arlite could be put on a profitable basis. As a result of this conclusion, Patrick and Baird personally loaned $100,000 to Arlite for use in its business. Knox was informed that there would be no difficulty in obtaining aluminum but after Virginia had acquired the stock of Arlite, Knox was confronted with that difficulty. He personally appeared before the War Production Board in New Jersey on three occasions and before the Board in Washington on four occasions and was turned down each time because of the Korean war crisis. Virginia caused members of its staff to spend a large amount of their time at the Arlite

---

[5] SEC. 122. NET OPERATING LOSS DEDUCTION.

    (b) AMOUNT OF CARRY-BACK AND CARRY-OVER.—

     \*      \*      \*      \*      \*      \*      \*

    (2) NET OPERATING LOSS CARRY-OVER.—

     \*      \*      \*      \*      \*      \*      \*

     (B) Loss For Taxable Year Beginning After 1949.—If for any taxable year beginning after December 31, 1949, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the five succeeding taxable years, except \* \* \*

plant in an attempt to make it profitable, but they were not successful. Then, on or about December 1, 1951, the United States Government forced Arlite to close down its smelting unit so that the Government could get complete control of aluminum scrap. Notwithstanding all the effort put forth by Virginia, Arlite lost approximately .$85,000 during the last 4 months of the year 1951. It was then that Virginia decided to sell either the stock or assets and business of Arlite. It did the latter. We hold that on the basis of such proof the acquisition by Virginia of all the stock of Arlite was for a bona fide business purpose and not principally for the interdicted purpose mentioned in section 129, *supra. Commodores Point Terminal Corporation,* 11 T.C. 411; *Alcorn Wholesale Co.,* 16 T.C. 75; *Berland's Inc. of South Bend,* 16 T.C. 182; *W A G E, Inc.,* 19 T.C. 249; *British Motor Car Distributors, Ltd., supra.* It follows that section 129, *supra,* is no authority for disallowing the claimed net operating loss carryover from Arlite in the amount of $153,400.60.

After Arlite became an empty shell, it lay dormant for about a month. For almost 2 years prior to 1952 the officers of Virginia had been discussing the advisability of placing all of the erection part of Virginia in a separate corporation. Most of its competitors operated in such a manner. On or about February 1, 1952, Virginia decided to use Arlite for this purpose. Arlite's name was changed to Winfield Construction Corporation and Virginia turned over to Winfield all of its erection facilities and construction personnel. During the period from February 1 to December 15, 1952, Virginia also paid Winfield $1,143,043.84 for doing the erecting work which Virginia had theretofore done itself. Winfield was successful in this line of business and, in the consolidated return for the period January 1, 1952, to December 15, 1952, Winfield reported a net income of $169,131.41 from which it deducted its own net operating loss carryover of $153,400.60.

We know of no reason why Winfield, in the consolidated return, should not be permitted to deduct from its own net income its own net operating loss carryover. Section 24.31(b) of Regulations 129, provides:

(2) *Other computations on separate basis.* The various other computations required by these regulations to be made by the several affiliated corporations shall be made in the case of each such corporation in the same manner and under the same conditions *as if a separate return were to be filed* * * * [Emphasis supplied.]

If Winfield had filed a separate return, it would have been allowed the carryover under section 122(b)(2)(B). See footnote 5 and *Alprosa Watch Corporation, supra.* However, the respondent calls our attention to the case of *Libson Shops* v. *Koehler,* 353 U.S. 382 (1957), rehearing denied 354 U.S. 943, and argues that to allow the

carryover would be contrary to the Supreme Court's interpretation of section 122 in that case. We do not agree. In that case, prior to the taxable year there involved, the same individuals incorporated 16 separate corporations to sell women's apparel at retail at separate locations, and at about the same time the same individuals incorporated another separate corporation to provide management services to the other 16. All the stock of the 17 corporations was owned, directly or indirectly, by the same individuals in the same proportions. All 17 corporations filed separate returns rather than consolidated returns for the years prior to the taxable year there involved. In some of those years 3 of the 16 corporations sustained net operating losses totaling $22,432.76. On August 1, 1949, the 16 corporations were merged into the management corporation. After the merger, the 3 corporations which sustained the losses prior to the merger, as branches of the merged company, also sustained losses during the taxable year. In its income tax return for the first year after the merger, the corporation resulting from the merger claimed under section 122, 1939 Code, a deduction of the $22,432.76 as a carryover of its premerger losses. The claimed deduction was disallowed by the United States District Court for the Eastern District of Missouri, whose decision was affirmed by the Court of Appeals (Eighth Circuit), 229 F. 2d 220, and in turn by the Supreme Court. It was the conclusion of the Supreme Court that the corporation resulting from the merger was not entitled to the carryover "since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses." In a footnote, the Supreme Court said:

We do not pass on situations like those presented in Northway Securities Co. v. Commissioner, 23 B.T.A. 532; Alprosa Watch Corp. v. Commissioner, 11 T.C. 240; A. B. & Container Corp. v. Commissioner, 14 T.C. 842; W A G E, Inc. v. Commissioner, 19 T.C. 249. In these cases a *single* corporate taxpayer changed the character of its business and the taxable income of one of its enterprises was reduced by the deductions or credits of another.

In the instant case, Winfield is the same corporate entity that sustained the net operating losses in question. It is not seeking to reduce the income of some other corporate entity by reason of such losses. It only seeks to carry forward and apply them against its own income. This is in accord with the statute, the regulations, and with our decisions. Sec. 122(b)(2)(B), 1939 Code; sec. 24.31 (b)(2) and (b)(3), Regs. 129; *Alprosa Watch Corporation, supra; A. B. & Container Corporation,* 14 T.C. 842.

Finally, the respondent, as an alternative, seeks to allocate $153,400.60 of "gross" income of Winfield to Virginia in accordance with the provisions of sections 45, 129(b), and 22(a) of the Internal Revenue Code of 1939. In his deficiency notice he says this is neces-

sary "to prevent the common control of the corporations from being used to reduce, avoid or escape taxes." Again, we do not agree.

Section 129(b) commences with the premise "in any case to which subsection (a) is applicable the Commissioner is authorized" etc. Since we have held that section 129(a) is not applicable, it follows that subsection (b) thereof has no application.

We have found that the acquisition by Virginia of the stock of Arlite and the later use of Arlite with its name changed to Winfield served a bona fide business purpose. Therefore, there is no valid reason to disregard the corporate entity of that company or to make any allocation of income between the corporations under section 22(a). *Moline Properties* v. *Commissioner*, 319 U.S. 436; *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422; *John Junker Spencer*, 19 T.C. 727.

Respondent's attack under section 45 [6] is likewise without merit. There is no evidence in the record to show that the dealings between the two corporate entities of Virginia and Winfield were not at all times at arm's length. In fact, we found them to be at arm's length. There is no evidence that any taxes are being evaded or that the income of Virginia and Winfield is not clearly reflected. Therefore, no necessity exists for an allocation under section 45. Section 45 authorizes respondent "to distribute, apportion, or allocate gross income, deductions, credits, or allowances" if he determines that such allocation, etc. "is necessary in order to prevent evasion of taxes or clearly to reflect income." Here, the respondent, as an alternative, proposes to allocate to Virginia, as representing gross income of Winfield, an amount ($153,400.60) exactly equivalent to the amount of the net operating losses of Arlite for the 20-month period ending August 31, 1951. No valid reason exists for such a proposed allocation except an attempt to prevent Winfield from securing the benefit of a net operating loss carryover. We hold that there is no justification in fact or in law for the respondent's alternative position. *Chelsea Products, Inc.*, 16 T.C. 840, affd. 197 F. 2d 620 (C.A. 3, 1952); *Cedar Valley Distillery, Inc.*, 16 T.C. 870; *Estate of Julius I. Byrne*, 16 T.C. 1234.

*Issue 3.*—The parties agree that the excess profits tax problem will be controlled in part by our decision herein and will have to be determined by a Rule 50 computation.

*Decision will be entered under Rule 50.*

---

[6] SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances, between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.