J. G. DUDLEY COMPANY, INCORPORATED (FORMERLY HEADEN HOSIERY MILLS, INCORPORATED), PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74218. Filed February 28, 1961.

*Arthur M. Jenkins, Esq.*, for the petitioner.
*John L. Ridenour III, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in income tax of $3,604.47 and $5,907.96 for the taxable years 1954 and 1955, respectively.

The only question for decision is whether the petitioner may properly claim carryovers, as deductions, of net operating losses from prior years to the taxable years.

FINDINGS OF FACT.

Some of the facts are stipulated, are so found, and the stipulated facts are included herein by this reference.

The petitioner was formerly Headen Hosiery Mills, Incorporated (herein sometimes called Headen Hosiery). Headen Hosiery was incorporated under the North Carolina laws on January 22, 1947, to engage in the hosiery manufacturing business. Its principal place of business was Hickory, North Carolina. The income tax returns for the taxable years were filed with the district director of internal revenue, Greensboro, North Carolina.

Until June 11, 1948, A. R. Headen was president and treasurer of petitioner and owned 316 shares. H. R. Eckard owned 33 shares, was vice president, and L. C. Headen (wife of A. R. Headen) was secretary and owned 1 share. On June 11, 1948, Eckard disposed of his stock by selling 32 shares to A. R. Headen and 1 share to J. G. Dudley, Jr. (hereinafter referred to as Dudley). The shareholders then were A. R. Headen and his wife, and Dudley, who was made vice president.

A. R. Headen died testate on January 26, 1950. The First National Bank of Winston-Salem, North Carolina, was named executor and Guy Dudley (who was not related to J. G. Dudley, Jr.) as trust officer of that bank, represented and controlled the 348 shares of stock owned by A. R. Headen's estate.

At the time of A. R. Headen's death on January 26, 1950, and for some time prior thereto he and Dudley were close friends. On January 30, 1950, Dudley was elected president and treasurer of the

corporation. At the time he owned 1 share of the 350 shares issued and outstanding.

On February 17, 1950, the board of directors unanimously agreed to liquidate as quickly as possible and on March 6, 1950, the board sold 22 knitting machines and 1 dyeing machine. On March 20, 1950, the board instructed Dudley "to proceed with all possible efforts" to sell the mill property.

Headen Hosiery Mills ceased manufacturing hosiery in the summer of 1950.

On October 20, 1950, the principal office of Headen Hosiery Mills, Incorporated, was removed from Hickory, North Carolina, to 108 Hudson Street, Shelby, North Carolina, at which place was located the J. G. Dudley Heating and Plumbing business, the sole proprietorship of Dudley.

On February 1, 1951, the board again instructed Dudley to endeavor to sell the equipment and supplies and the land and building of Headen Hosiery in Hickory, North Carolina.

Headen Hosiery ceased selling and shipping hosiery early in 1951 and for all practical purposes was out of the hosiery business.

On January 8, 1952, the board considered an offer made by Shuford Hosiery Mills, Inc., to purchase the land and building in Hickory, North Carolina, owned by Headen Hosiery, and unanimously resolved, after giving consideration to the offer and to the fact that Headen Hosiery was without an active manager and had had none since the death of A. R. Headen, to accept the offer. In January 1952 Headen Hosiery's land and building were sold.

The minutes of a regular meeting of the stockholders held on February 1, 1952, disclose that as of January 31, 1952, there were few assets remaining and provision was made for disposing of most of the remaining assets and liabilities. At the meeting a motion to redeem the 348 shares of Headen Hosiery Mills' stock held by the Estate of A. R. Headen was passed.

On March 7, 1952, Maybelle H. Dudley, wife of Dudley, acquired by purchase from L. C. (Mrs. A. R.) Headen 1 share of stock in Headen Hosiery, and on the same day, J. G. Dudley III also acquired by purchase from petitioner 1 share of stock.

On October 7, 1952, the 348 shares belonging to the estate of Headen were purchased and canceled. Immediately prior thereto the entire assets of Headen Hosiery Mills, Incorporated, consisted of the following:

| | |
|---|---|
| Cash in bank | $4,238.77 |
| Notes receivable | 100.00 |
| Mortgages receivable | 8,500.00 |

Immediately after the purchase and cancellation of the 348 shares belonging to the estate of Headen, the entire assets of Headen Hosiery Mills, Incorporated, consisted of the following:

Cash in bank _____ $663.17
Note receivable _____ 100.00

The assets of Headen Hosiery as of December 31, 1952, consisted of cash in the amount of $19.25.

On February 2, 1953, the board ordered Headen Hosiery placed in an inactive status.

On page 1 of the 1953 income tax return of Headen Hosiery there is typed the following notation: "This corporation was placed in an inactive status Dec. 31, 1952."

As of December 31, 1953, Headen had no assets.

On February 5, 1954, the charter of Headen Hosiery was amended, changing its name to J. G. Dudley Company, Incorporated, and changing its business purposes to electrical, heating, plumbing, contracting, and related types of work.

On February 8, 1954, Dudley offered to buy 10 shares of the capital stock of petitioner at par of $100 per share, which offer was accepted, the subscription price was paid, and the shares were issued on or about February 27, 1954.

On or about March 1, 1954, Dudley transferred the assets (with certain exceptions) of the plumbing, electrical, heating, air-conditioning, and contracting business theretofore conducted by him as a sole proprietorship to petitioner in exchange for 100 shares of stock, $1,262 cash, and assumption by petitioner of the business liabilities. Thereafter petitioner engaged in said business. On or about April 27, 1954, Dudley transferred the remaining physical assets of the proprietorship to petitioner.

Sometime in 1953, prior to the time of transferring the proprietorship to the corporation Dudley was aware of the possibility that the corporation's previous losses might be of some use taxwise. In the latter part of 1953 Dudley advertised the corporation for sale in the Wall Street Journal.

Headen Hosiery sustained net operating losses as follows:

1950 _____ $25,112.90
1951 _____ 12,968.49
1952 _____ 14,211.89
1953 _____ 50.45

J. G. Dudley Company, Incorporated, realized net income as follows:

1954 _____ $12,014.90
1955 _____ 19,693.21

On its returns for the taxable years 1954 and 1955 petitioner claimed net operating loss carryover deductions in the amounts of $12,014.90 and $19,693.21, respectively.

The business of petitioner which incurred the losses in question was entirely different from its business which produced the income against which it now seeks to offset these losses by means of the net operating loss deduction.

The Commissioner disallowed the claimed net operating loss deductions with the explanation that they were not allowable under section 122, 1939 Code, since the business which incurred the loss was substantially different from the business operated by petitioner in the taxable years, and for the further reason that the holders of petitioner's capital stock acquired control thereof after October 8, 1940, and the principal purpose of such acquisition was the evasion or avoidance of Federal income tax by securing the benefit of a deduction or credit not otherwise allowable, citing section 129(a) of the 1939 Code.

### OPINION.

We think the Commissioner's determination finds support in *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382. There 16 sales corporations were merged into the taxpayer corporation and the effect "was to convert 16 retail businesses and one managing agency, reporting their incomes separately, into a single enterprise filing one income tax return." The Supreme Court held that the petitioner could not make use by way of carryover of the previously sustained net operating losses of some of the merged corporations. This conclusion was based upon a holding that petitioner was not the same taxable entity as that which sustained the loss and reliance was placed on the interpretation of the term "the taxpayer" as it is used in section 122(b)(2) of the 1939 Code rather than section 129. In reaching this result without relying on section 129, the Court said:

an alternative argument made by the Government is dispositive of this case. The Government contends that the carry-over privilege is not available *unless there is a continuity of business enterprise.* It argues that the prior year's loss can be offset against the current year's income only to the extent that this income is derived from *the operation of substantially the same business which produced the loss.* Only to that extent is the same "taxpayer" involved. [Emphasis supplied.]

The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year. There is, however, no indication in their legislative history that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which

had been operated and taxed separately before the merger. What history there is *suggests* that Congress primarily was concerned with the fluctuating income of a single business.

This distinction is recognized by the very cases on which petitioner relies. In *Stanton Brewery, Inc.* v. *Commissioner*, 176 F. 2d 573, 577, the Court of Appeals stressed the fact that the merging corporations there involved carried on "essentially a *continuing enterprise*, entitled to all * * * benefits [of the carryover provisions] in ameliorating otherwise harsh tax consequences of fluctuating profits or expanding business." (Emphasis supplied.) And in *Newmarket Manufacturing Co.* v. *United States*, 233 F. 2d 493, 497, the court expressly distinguished the case before it from the instant case on the ground that there "one single business" was involved in the merger, while in this case there were "several businesses."

This difference is not merely a matter of form. In the *Newmarket* case, *supra*, a corporation desiring to change the state of its domicile caused the organization of a new corporation and merged into it. The new corporation sought to carry back its post-merger losses to the pre-merger income of the old corporation. But for the merger, the old corporation itself would have been entitled to a carry-back. * * *

True it is that the factual situation in *Libson* differs from the one before us in that there was no continuing corporate charter in *Libson*, while here there was, and no merger here, while there was in *Libson*. Further, the Court in footnote 9 to *Libson* in commenting on cases which are similar to this one on their facts and on which petitioner relies, said:

We do not pass on situations like those presented in *Northway Securities Co.* v. *Commissioner*, 23 B.T.A. 532; *Alprosa Watch Corp.* v. *Commissioner*, 11 T.C. 240; *A.B. & Container Corp.* v. *Commissioner*, 14 T.C. 842; *W A G E, Inc.*, v. *Commissioner*, 19 T.C. 249. In these cases a *single* corporate taxpayer changed the character of its business and the taxable income of one of its enterprises was reduced by the deductions or credits of another.

Nevertheless, we think the Supreme Court in *Libson* was looking beyond legal niceties and was persuaded by the substance of the transaction before it.

Here we have a corporation formed in 1947 with a history of substantial losses in 1950, 1951, 1952, and a smaller loss in 1953. The principal stockholder and active manager had died early in 1950. From the time of his death, the corporation ceased the hosiery business, its only business, and by early 1953 it had, for all practical purposes, been liquidated. As disclosed in our Findings of Fact, on October 7, 1952, the corporation, with funds provided by almost complete liquidation, purchased and canceled the 348 of its outstanding 350 shares which had been owned by its deceased manager. This left control in the hands of the Dudleys—husband, wife, and son—each of whom owned 1 share. Though its assets were gone, no actual business was being conducted, and Dudley had tried to sell "the corporation" which was no more than a shell, the corporate charter was kept alive and in early 1954 the charter was amended and the

corporate name was changed so that it could conduct an electrical, heating, and plumbing business. In February 1954 Dudley purchased an additional 10 shares of corporate stock at $100 per share and next month transferred to the corporation, in exchange for more stock and cash, his sole proprietorship of plumbing, heating, etc. In the years 1954 and 1955 the new business prospered and the corporation now seeks to deduct the losses of the hosiery business in prior years from the profits of the plumbing business.

If we apply the reasoning of the Supreme Court in *Libson*, we have here the kind of situation in which the losses of an abandoned business should not be allowed as a carryover to offset current profits of petitioner's new business. There has not been met here the "requirement of a continuity of business enterprise" such as would justify allowing petitioner to utilize its claimed loss carryover, and this regardless of whether or not there was any motive of tax avoidance when Dudley acquired control of the petitioner. See *Irving-Kolmar Corporation*, 35 T.C. 712, and *Mill Ridge Coal Company* v. *Patterson*, 264 F. 2d 713.

On the latter point, whether or not Dudley acquired control of petitioner for the purpose of avoiding income tax by securing the benefit of a loss deduction which he would not otherwise enjoy, thus making section 129, I.R.C. 1939, applicable, the burden is on petitioner to show error in the Commissioner's determination that tax avoidance was the principal purpose. This burden petitioner has attempted to meet by testimony to the effect that control of the corporation was acquired at a time when Dudley knew nothing of the tax use that might have been made of its losses; that he knew nothing of its losses, though he signed its tax return for 1949 which showed losses for 1947 and 1948; that the corporate charter was kept alive for 3 years in order to protect its shareholders from alleged possible claims for patent infringement until the statute of limitations should run against such claims; and that the "primary purpose was to get my business in corporate form." The testimony relative to these reasons was the oral testimony of Dudley and an officer of the bank which became Headen's executor. The alleged patent infringement claims were said to be evidenced by letters which had been destroyed and could not be produced. The alleged agreement to keep the corporation alive was supported only by oral testimony of these same witnesses and was said to have been based on legal advice. No corroborative written evidence was offered and the lawyer who gave such advice was not called. Furthermore, we are not persuaded that the alleged purpose could have been accomplished by keeping the corporation alive after its assets had been used to cancel Headen's majority stock. As to the purpose of putting Dudley's proprietorship in corporate

form, this could as easily have been done by forming a new corporation though Dudley testified he did not do this because it would have cost some $300. In this respect we note that just before he transferred his proprietorship to the petitioner he acquired 10 additional shares at a total cost of $1,000. It is not apparent as to why it would have cost more to form a new corporation than to effect the transfer of his proprietorship to the old in the manner he did. Furthermore, before the transfer was effected, Dudley had attempted to dispose of the corporate shell of the old corporation in 1953 through an advertisement in the Wall Street Journal. This is hardly consistent with a primary purpose to keep the old corporation alive so that he could transfer to it his proprietorship assets. We note also that this latter move was made at a time when Dudley had consulted an attorney and admittedly knew that the previous losses of the corporation might be used to tax advantage. In short, we place little credence in the reasons thus advanced and no matter whether Dudley is considered as having gained control of petitioner in 1952 when he and his wife and son remained the only stockholders, at 1 share each, after Headen's stock was canceled, or later, in 1954, when he purchased an additional 10 shares, we hold the petitioner has not carried its burden of showing the Commissioner's determination to be erroneous. If control was acquired on the later date section 269, I.R.C. 1954, would be brought into play. This section provides for the disallowance of the claimed deduction where, after October 8, 1940, any person acquires control of a corporation with the principal purpose of evading income tax by securing the benefit of a deduction he would not otherwise enjoy. *Urban Redevelopment Corporation*, 34 T.C. 845; *Thomas E. Snyder Sons Co.*, 34 T.C. 400.

*Decision will be entered for the respondent.*