Norden-Ketay Corporation (formerly Ketay Instrument Corporation) v. Commissioner.
Norden-Ketay Corp. v. Commissioner
Docket No. 82272.
United States Tax Court
T.C. Memo 1962-248; 1962 Tax Ct. Memo LEXIS 62; 21 T.C.M. (CCH) 1316; T.C.M. (RIA) 62248; October 23, 1962
*62 Petitioner corporation which had engaged for many years in a coal-mining business, sold all of its operating assets in 1951, and as a result thereof sustained a net operating loss in said year. Thereafter, said corporation acquired the stock of three other corporations which manufactured precision electronic components, dissolved said corporations, took over the assets and going businesses thereof, and continued to operate an electronics business throughout the taxable year. Held, that there was no "continuity of business enterprise" between the former mining business and the subsequent electronics business; and, accordingly, that petitioner is not entitled to carry over and deduct the 1951 net operating loss against its 1954 income realized in its new and different business of manufacturing electronic components. Libson Shops, Inc. v. Koehler, 353 U.S. 382, and Huyler's, 38 T.C. - (Aug. 30, 1962), followed. Don V. Harris, Jr., Esq., for the petitioner. Dean P. Kimball, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined a deficiency in petitioner's income tax for the calendar year 1954 in the amount of $630,033.33. The basic question for decision is whether the petitioner, which had experienced substantial changes in the character of its business, its name, its place of operation, its management, and its capital structure - as the result of the discontinuance of its former business of mining coal, and its taking over a new type of business of manufacturing electronic components that had theretofore been operated by three other corporations - may under section 172 of the 1954 Code and section 122 of the 1939 Code, carry over and deduct from its 1954 *64 income from such electronics business, a net operating loss sustained in 1951 in the former business of mining and selling coal. Another issue relating to an adjustment which increased petitioner's net sales for 1954, was abandoned by petitioner at the trial by amending its petition so as to delete all references therein to said issue. Findings of Fact General Facts Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference. The petitioner is a dissolved Illinois corporation which, during the taxable calendar year 1954 here involved, had its principal place of business in New York City. It filed a corporation income tax return for said year with the district director of internal revenue for the Lower Manhattan District of New York. The notice of deficiency herein was issued on May 12, 1959. The petitioner was thereafter dissolved on July 1, 1959. The petition to this Court was subsequently filed on August 7, 1959. Under the provisions of section 94 of the Business Corporation Act of the State of Illinois, petitioner was authorized to bring and maintain this action in its own name, despite *65 its dissolution. No dispute is here involved regarding petitioner's right to conduct the present proceeding. Petitioner was incorporated under the laws of the State of Illinois on July 20, 1886, under the name of "The Consolidated Coal Company of St. Louis." Its name was changed on February 20, 1935, to "The Consolidated Coal Company." [1] Thereafter, in connection with events and transactions presently to be described, petitioner underwent other changes of name as follows: On April 15, 1953, its name was changed to "Ketay Manufacturing Corp."; on September 10, 1954, its name was changed to "Ketay Instrument Corporation"; and on February 11, 1955, its name was changed to "Norden-Ketay Corporation," which is the name it continued to bear until its above-mentioned dissolution, and under which it filed its petition herein. Facts re Consolidated at and prior to sale of coal business assets in February 1951 The business of Consolidated from the time of its *66 incorporation in 1886 until February 1951, was that of mining and selling bituminous coal. Its principal office while so engaged was in St. Louis, Missouri; but its extensive mining properties were located in the coal fields of southern Illinois. It also owned all of the outstanding capital stock of four subsidiary companies. [2] During the years 1949 and 1950, respectively, its net sales were $7,050,114.43 and $7,146,465.98, and its net incomes before Federal income taxes were $246,930.79 and $278,290.15. As of December 31, 1949 and 1950, its total assets were $8,952,838.95 and $9,086,818.39, respectively; and at said dates the amounts of its earned surplus were $3,174,985.05 and $3,243,275.20, respectively. In the Fall of 1950, an attorney representing a decedent's estate which *67 owned the largest single block of Consolidated's stock, approached the New York investment banking firm of Lehman Brothers, and suggested the possibility of said firm acquiring a controlling interest in said stock. Lehman Brothers was receptive to the suggestion; and thereupon it made arrangements with the Bankers Trust Company of New York to solicit (on behalf of Lehman Brothers, as undisclosed principal) options to purchase shares from the larger shareholders of Consolidated. After options covering approximately 80 percent of the Consolidated stock had thus been secured, Lehman Brothers began to search for a buyer of such stock in the event that it should decide to exercise such options. Following several unsuccessful attempts, Lehman Brothers did locate a potential purchaser, which was Zeigler Coal & Coke Company (hereinafter called Zeigler), an Illinois corporation engaged in operating coal mines in Illinois. Lehman Brothers' desire was to sell the stock of Consolidated; and in its preliminary negotiations with Zeigler, an informal agreement was reached to sell the shares which it had under option, at a price which would yield it a profit of $200,000. Later however, Zeigler indicated *68 that it would be interested only in buying Consolidated's assets, and not the stock. Lehman Brothers thereupon advised that it would be agreeable to such a revised transaction, provided that it could realize the contemplated $200,000 profit, and provided also that it would not have to bear any expense that it would not bear if it sold the stock. Lehman Brothers thereupon instructed its agent, the Bankers Trust Company, to exercise the options to purchase shares of Consolidated stock, held on behalf of Lehman Brothers; and by February 28, 1951, the Trust Company had purchased 47,447 shares (or 94.7 percent of all the shares outstanding) on behalf of Lehman Brothers. On February 26, 1951, Consolidated and Zeigler entered into an agreement of sale; and 2 days later, on February 28, 1951, Consolidated conveyed to Zeigler all of its assets except cash and United States Treasury obligations, and received in partial payment from Zeigler the sum of $3,900,000 in cash. In addition to the cash thus paid by Zeigler, that corporation also agreed to pay over to Consolidated at later dates, 50 percent of the excess over $800,000 which Zeigler might receive upon its sale of certain so-called *69 "disposable properties," [3] received in the purchase from Consolidated. Immediately upon receipt of the cash payment of $3,900,000 above mentioned, the directors of Consolidated declared and there was paid a "partial liquidating dividend" of $76.50 per share; and in May of 1951, the directors declared another "partial liquidating distribution" of $1.50 per share, which amount also was paid in the latter month. Lehman Brothers utilized said liquidating dividend and distribution (totaling $78 per share) which it thus received, for paying bank loans incurred by it *70 in purchasing the shares of Consolidated, and also for paying certain brokerage commissions which it incurred in connection with said purchase. In February 1951, a statement of intent to dissolve Consolidated was filed on behalf of that corporation with the Secretary of State of the State of Illinois. At no time after the above-described sale of operating assets to Zeigler did Consolidated ever conduct, manage, or operate a business of mining or selling coal. Consolidated sustained a loss on the above-mentioned and above-described sale of its operating assets related to coal mining, in the amount of $3,509,043.55; and said corporation thereby sustained a net operating loss in said year 1951 in the amount of $3,466,387.52. Facts re Consolidated following sale of coal business assets In the Spring of 1951, Lehman Brothers disposed of three blocks of its shares of Consolidated stock, as follows: 1. March 14, 1951, 4,447 shares were transferred to Emmanuel Becker, the attorney who had suggested to Lehman Brothers the acquisition of the Consolidated stock. Said shares were transferred at Consolidated's unrecovered cost of $1.50 per share, pursuant to an agreement between the *71 attorney and Lehman Brothers, that the latter would give Becker 10 percent of any profit that Lehman Brothers might realize from the Consolidated stock transactions. The shares so transferred to Becker were intended to assure to Becker 10 percent of whatever profit Lehman Brothers might realize in final liquidation of Consolidated. 2. March 21, 1951. 2,372 shares were transferred to Paul Weir, a mining engineer and geologist, who had assisted Lehman Brothers in its search for a buyer for the Consolidated stock. These shares were likewise transferred at a price of $1.50 per share, pursuant to an agreement to share with him 5 percent of any profit which Lehman Brothers might realize on the Consolidated deal. These shares were subsequently reacquired by Consolidated in March or April, 1953. 3. April 1951. 3,500 shares were transferred to Joseph H. McConnell, then president of the National Broadcasting Company, at $1.50 per share. The record herein does not reveal the reason for said transfer of shares to McConnell, other than it was made for reasons unrelated to the other transactions relevant to the present proceeding. In June 1951, Consolidated's capital structure was altered, *72 by reducing the par value of its stock from $100 per share to $1 per share, thus reducing its stated capital from $5,000,000 to $50,000. During the interval from the sale of its assets to Zeigler on February 28, 1951, to the end of the year 1951, Consolidated was inactive. Zeigler hired two former employees of Consolidated to attend to collecting the accounts receivable, and to paying the accounts payable which Zeigler had purchased and assumed. Also, two of the directors of Consolidated had some correspondence with the president of Zeigler, wherein they urged that Zeigler proceed with greater speed to sell the above-mentioned "disposable properties," in the proceeds of which Consolidated was to share after the amount thereof had reached $800,000. By the end of the year 1951, Zeigler had realized approximately $790,000 from the sale of about 55 percent of such disposable properties. Following the end of the year 1951, Zeigler made an offer to Consolidated to purchase the latter's interest in the disposable properties for $250,000. Consolidated accepted the offer, and on March 26, 1952, it entered into a "First Supplemental Agreement" with Zeigler, the here material provisions of *73 which were, in substance, as follows: (1) Zeigler agreed to pay, and Consolidated agreed to accept, $250,000 in full settlement of the balance of the purchase price under the agreement between the two companies of February 26, 1951. (2) Consolidated agreed that upon receipt of the aforesaid sum of $250,000 it would "immediately take steps to dissolve" and that it would "complete its dissolution as quickly as may be reasonable possible." The $250,000 mentioned in the foregoing agreement was paid by Zeigler to Consolidated immediately following execution of the same. The officers of Consolidated, upon receipt of the above-mentioned $250,000, began to consider the possibility of not proceeding further with the dissolution of the corporation, but rather of having said corporation enter into some new type of business. Negotiations were thereupon undertaken by Consolidated with Zeigler to have that corporation waive the requirement that Consolidated be dissolved. About a year later, Zeigler and Consolidated entered into a "Second Supplemental Agreement" on April 2, 1953, wherein it was provided that Zeigler would waive the requirements that Consolidated be dissolved. Five days *74 later, on April 7, 1953, the stockholders of Consolidated adopted a resolution that the voluntary dissolution proceedings previously begun, should be revoked; and 2 days thereafter, on April 9, Consolidated filed with the Secretary of State of the State of Illinois a "Statement of Revocation of Dissolution Proceedings." Previously thereto, on March 30, 1953, said officials had issued a certificate that as of said date Consolidated was still in good standing as a domestic corporation of the State of Illinois. During the interval between the above-mentioned March 1952 "First Supplemental Agreement" between Zeigler and Consolidated and the just-mentioned revocation of the dissolution proceedings, the officers of Consolidated conducted a search for some business which the corporation might buy. In this connection, sometime in the Fall of 1952, the officers of Consolidated began negotiations with an individual named Benjamin Gross, who represented the stockholders of a 3-member group of corporations, Ketay Manufacturing Corp., Kinetix Instrument Co., and Ketay Research & Development Co. (said three corporations are hereinafter referred to collectively as the "Ketay companies"), with a *75 view to purchasing all the capital stocks of said three Ketay companies. The Ketay companies were at that time engaged in the business of developing, manufacturing, and selling precision electronic components. These negotiations culminated in an agreement dated April 6, 1953, whereby Consolidated agreed to purchase all the outstanding shares of each of the three Ketay companies for a total consideration of $2,725,000, payable $100,000 in cash at the closing date, with the balance payable in installments on or before March 1, 1958. Said agreement was thereafter amended in one respect, viz., to increase the purchase price by $25,000. The purpose of buying said stock was to obtain the assets of the Ketay companies. Concurrently with the execution of the stock purchase agreement of April 6, 1953, and as an integral part of the Ketay stock purchase transaction, Consolidated and the Ketay stockholders entered into a second agreement whereunder Consolidated agreed that it would increase the number of its authorized shares of capital stock from 50,000 to 75,000, and that it would issue and sell to the Ketay stockholders, warrants entitling them to purchase the additional 25,000 shares of *76 Consolidated common stock at a price of $4.95 per share. The selling price of the warrants themselves was fixed at 5" for each share of stock covered thereby. On April 9, 1953, Consolidated's articles of incorporation were amended in the following respects: (1) Its corporate purposes were expanded to include the purposes of dealing in personal property and of engaging in manufacturing and mercantile enterprises; (2) Its authorized shares of $1 per share common capital stock were increased from 50,000 to 75,000; and (3) The preemptive right of shareholders to subscribe for or acquire additional shares was abrogated. Thereafter, on April 15, 1953, closing took place under the aforesaid agreements between Consolidated and the Ketay stockholders; and Consolidated thereupon acquired all of the outstanding capital stock of each of the three Ketay corporations. On the same day, immediately following Consolidated's purchase of the Ketay stocks, each of said Ketay companies filed with the Secretary of State of the State of New York its certificate of dissolution. Still on the same day, Consolidated changed its name to "Ketay Manufacturing Corp." [4] On the following day, April 16, *77 the New York Secretary of State dissolved said three corporations. Consolidated-Ketay thereupon took over the going businesses, and became the owner of all of the assets and properties of the former Ketay companies; and it also assumed all of the liabilities of said companies. Consolidated-Ketay moved its principal office to New York City, and continuously thereafter engaged, until its own dissolution on July 1, 1959 (as hereinabove found as a fact), solely in the same business formerly carried on by the former Ketay companies, i.e., the development, manufacture and sale of precision electronic components. Also on April 17, 1953, the stockholders of Consolidated-Ketay elected eight directors for the corporation, four of whom had been stockholders in the former Ketay companies. [5] Following this stockholders' meeting, the directors met and elected new officers for the corporation, *78 including in various positions all those individuals who had been stockholders in the former Ketay companies. Said officers continued to serve throughout the taxable year 1954 here involved. Subsequently, on August 15, 1953, all of the above-described stock warrants which had been issued to the former Ketay stockholders, were exercised by said individuals or by other parties to whom such individuals had transferred or assigned the same. The capital structure of Consolidated-Ketay was subsequently changed in the following respects: (1) On November 2, 1953, the authorized common capital stock was changed and increased from 75,000 shares having a par value of $1 per share, to 850,000 shares having a par value of 10" per share; and said 75,000 shares of $1 parvalue stock were split 10 for 1, and reclassified and changed into *79 750,000 shares having a par value of 10" per share. (2) On June 22, 1954, the authorized common capital stock was further increased from 850,000 shares, par value of 10" per share, to 2,000,000 shares, par value of 10" per share. On September 29, 1954, 300,000 of the newly authorized shares were sold to underwriters for subsequent sale to the members of the public. Consolidated-Ketay, on the Federal income tax return which it filed for the taxable calendar year 1954 here involved, reported taxable income from its electronics business of $1,007,623.38, before net operating loss deduction. On this same return it carried over from the year 1951 a net operating loss of $2,304,125.58 which had resulted principally from the sale of the assets of the coal-mining business; and it claimed such operating loss as a deduction - thereby reporting loss on the return for 1954 in the amount of $1,296,502.20. The respondent, in his notice of deficiency herein, disallowed said claimed net operating loss deduction. Opinion The basic issue in this case is, as above stated, whether the petitioner is entitled to carry over and deduct against its 1954 income from a business of manufacturing electronic *80 components, a net operating loss sustained by the same corporate entity in 1951 when it, as a coal-mining company, disposed of the operating assets of the coal-mining business which it had theretofore conducted. We have, only recently, considered a similar question in the case of Huyler's, 38 T.C. - (Aug. 30, 1962). We there held, applying the "continuity of business enterprise" principle enunciated by the Supreme Court in Libson Shops, Inc. v. Koehler, 353 U.S. 382, that a taxpayer-corporation which had experienced substantial changes in its stock ownership and in the character of its business, could not carry over and deduct from its income of years following such changes, net operating losses sustained in its former business prior to the changes. There are, of course, factual distinctions between the Huyler's case and the instant case. For example, Huyler's went from a business of manufacturing candy and operating a chain of restaurants to a business of manufacturing aluminum products; while here, the petitioner's original business was that of mining and selling coal, and its subsequent business (as it existed in the taxable year for which the deduction involved *81 was claimed) was that of manufacturing precision electronic components. Also, in Huyler's, there was a Chapter X bankruptcy reorganization, while here there was no reorganization. But these are mere distinctions, without any real underlying differences of legal principle which would call for a different result here. In the instant case, in the interval between the year (1951) when the net operating loss here involved was sustained and the year (1954) in which petitioner has sought to carry over and deduct said loss, there were radical changes in the business enterprise involved - including changes in the capital structure of the business, in the location of the business, in the management of the business, in the stock ownership of the business, in the type of the business and its products, and even in the name of the business. We are impelled to conclude in such circumstances, that the 1954 income was not produced from substantially the same business as that which produced the 1951 loss; and hence, that there was no "continuity of business enterprise," as that phrase is used in the Libson Shops case and as it has been construed and applied by this and other courts in: Huyler's, supra; *82 J. G. Dudley, Inc., 36 T.C. 1122, affd. (C.A. 4), 298 F. 2d 750; Mill Ridge Coal Co. v. Patterson, (C.A. 5), 264 F. 2d 713, certiorari denied 361 U.S. 816; and Willingham v. United States, (C.A. 5), 289 F. 2d 283. Since the conclusion which we have above set forth is dispositive of this case, we find it unnecessary to discuss the other contentions which petitioner presented. We hold that deduction by petitioner of the net operating loss here involved is not allowable. We sustain the determination of the Commissioner in this regard. Decision will be entered for the respondent. Footnotes
1. Hereinafter, when reference is made to the corporation in connection with events and transactions occurring when it bore the name of "The Consolidated Coal Company," said corporation will be referred to as "Consolidated."↩
2. The record contains no definite evidence as to the types of business carried on by these subsidiaries. Perhaps some indications in this regard may be gleaned from the names of the subsidiaries: Consol Power Company, St. Louis, Missouri; Jefferson Southwestern Railroad Company, St. Louis, Missouri; Federal Coal Corporation, Chicago, Illinois; and Jefferson Oil and Gas Corporation, St. Louis, Missouri.↩
3. The "disposable properties" (which were assets of Consolidated that Zeigler did not plan or desire to retail) included all of the tangible assets of Consolidated which were situated in four Illinois counties, and also the capital stock of three of the four of Consolidated's subsidiary corporations. The $3,900,000 cash payment was sufficient only, when paid out to Consolidated's shareholders, to cover the out-of-pocket costs of Lehman Brothers. That firm had planned that its share of the proceeds from the sale of the "disposable properties" would constitute its profit on the purchase and sale of Consolidated stock.↩
4. As hereinabove found, the corporate name was subsequently changed on September 10, 1954, to "Ketay Instrument Corporation"; and its name was again changed on February 11, 1955, to "Norden-Ketay Corporation." Said corporation will be hereinafter referred to for convenience as "Consolidated-Ketay."↩
5. At least three and possibly all four of the other directors were associated with Lehman Brothers, and they had been elected in February 1951, shortly prior to the sale of assets by Consolidated to Zeigler. None of the eight directors of Consolidated-Ketay had been associated with Consolidated during the years when it operated the coal-mining business.↩