The Wallace Corporation v. Commissioner.
Wallace Corp. v. Commissioner
Docket No. 95195.
United States Tax Court
T.C. Memo 1964-10; 1964 Tax Ct. Memo LEXIS 325; 23 T.C.M. (CCH) 39; T.C.M. (RIA) 64010; January 23, 1964
Robert Ash, 1921 Eye St., N.W., Washington, D.C. and Charles H. Burton for the petitioner Donald P. Krainess for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies *327 in petitioner's Federal income tax for its fiscal years ended June 30, 1958, and June 30, 1959, in the respective amounts of $44,271.43 and $15,599.42. The sole issue for our consideration is whether respondent erred in determining that petitioner is not entitled to net operating loss deductions in each of the fiscal years in issue for carryover losses from prior years. Petitioner has not assigned error to other determinations in respondent's notice of deficiency. Findings of Fact Petitioner, The Wallace Corporation, is a corporation organized under the laws of Missouri, with its principal place of business in Richwood, West Virginia. It was incorporated on September 19, 1940, and it is successor to Steele-Wallace Corporation, a West Virginia corporation. Petitioner's Federal income tax returns for the fiscal years ended June 30, 1958, and June 30, 1959, were filed with the district director of internal revenue at Parkersburg, West Virginia. Petitioner reported taxable income, before net operating loss deductions, of $111,203.34 and $147,927.25 in the fiscal years ended June 30, 1958, and June 30, 1959, respectively. Petitioner claimed net operating loss carryover deductions in *328 the amounts of $111,203.34 and $29,126.17 in the fiscal years ended June 30, 1958, and June 30, 1959, respectively. The total net operating loss carryover of $140,329.51 was computed by petitioner as follows: Year Ended
$ 94,026.98
6/30/53 - Loss
Year Ended
3,178.33
6/30/54 - Profit
Year Ended
3,356.40
6/30/55 - Loss
Year Ended
6,624.48
6/30/56 - Loss
Year Ended
39,499.98
6/30/57 - Loss
Total
$140,329.51
Prior to January 3, 1958, petitioner was engaged in the business of manufacturing and/or selling at wholesale toothpicks, clothespins, and wax-lined food trays. It distributed these products nationwide. Petitioner's manufacturing and packaging plant at Richwood consisted of two buildings and a power plant located between the two buildings. There were also on the property warehouse buildings, an office building adjacent to the plant buildings, and a residence occupied by petitioner's plant manager. As of January 3, 1958, petitioner had authorized and outstanding 100,000 shares of common stock having a par value of $1 per share. Mahlon B. Wallace, Jr., sometimes hereinafter referred to as Wallace, owned all but 2 shares of petitioner's outstanding *329 and authorized common stock. R. W. Chubb and William T. Christmas, the latter of whom will sometimes hereinafter be referred to as Christmas, each owned 1 share of common stock, in which Wallace held the equitable ownership in order to qualify them as directors of petitioner. As of January 3, 1958, petitioner had outstanding 5 percent income debentures having unpaid principal balances totaling $280,000. These debentures were owned by members of the Wallace family as follows: Deben-
Unpaid
ture No.
Owner
Balance
T-1
Mahlon B.
$ 81,623.69
Wallace, Jr.
T-2
Audrey Faust
78,416.19
Wallace
T-3
Grace W.
2,500.00
Wallace
T-4
Audrey Faust
21,340.50
Wallace
T-5
Grace W.
30,709.50
Wallace
T-6
Grace W.
10,410.12
Wallace
T-7
Audrey Faust
55,000.00
Wallace
Total
$280,000.00
Forster Mfg. Co., Inc., sometimes hereinafter referred to as Forster, is a Maine corporation incorporated in 1924. On January 3, 1958, Forster's principal office was located in Farmington, Maine. It has issued and outstanding 2,010 shares of common stock having a par value of $100 per share. As of January 3, 1958, all of Forster's common stock was owned *330 by a revocable trust known as the Hodgkins Trust. The trustees of the Hodgkins Trust were T. R. Hodgkins, Frances B. Hodgkins, Casco Bank and Trust Company of Portland, Maine, and Richard Bowers, an attorney in Boston, Massachusetts. The Hodgkins Trust was was up for the benefit of the children and grandchildren of T. R. Hodgkins, sometimes hereinafter referred to as T. R., and his former wife, Frances B. Hodgkins, sometimes hereinafter referred to as Frances. T. R. contributed approximately 55 percent of Forster's stock to the Hodgkins Trust and Frances contributed the remainder, approximately 45 percent of Forster's stock. Forster is engaged in the business of manufacturing and selling many wood products such as toothpicks and clothespins, and flat veneer products such as ice cream spoons, ice cream sticks, tongue depressors, coffee stirrers, and meat skewers. Forster distributed its products nationwide and enjoyed between 30 and 40 percent of the total sales in the United States on the items it manufactured and sold. On January 3, 1958, all of the issued and outstanding stock of petitioner was sold for $22,500 by Wallace to T. R. and Frances. The transfer was formally accomplished *331 on petitioner's books on June 25, 1958, and stock certificates were issued as follows: Number
Name
of Shares
T. R. Hodgkins
1
Virginia Graef Hodgkins [1]
54,999
Frances B. Hodgkins
45,000
Total
100,000
Also on January 3, 1958, Forster purchased all of petitioner's outstanding 5 percent income debentures from the members of the Wallace family for the total consideration of $280,000, payable as follows.. Forster executed promissory notes dated January 3, 1958, and due February 3, 1958, payable to the Estate of Grace Whitelaw Wallace, Audrey Faust Wallace, and Mahlon B. Wallace, Jr., aggregating $92,500; the remainder of the purchase price, $187,500, was evidenced by fifteen serial notes dated January 3, 1958, and bearing interest at 5 percent a year and 6 percent after maturity, and payable to the Estate of Grace Whitelaw Wallace, Audrey Faust Wallace, and Mahlon B. Wallace, Jr. The serial notes were all of like terms except as to number, denomination, payee, and maturity. T. R. has been associated with Forster since 1934, and at the time of trial herein he *332 was its president and general manager. T. R. was familiar with the operations of The Wallace Corporation which was one of Forster's competitors. He belonged to trade associations of which Wallace and Christmas were members, and he met them several times at various trade association meetings. Sometime in 1937 T. R. attempted to negotiate with Wallace for the purchase of The Wallace Corporation. The parties could not agree on a purchase price and no further negotiations were had at that time. Sometime in the latter part of 1957 T. R. fortuitously met Christmas at a resort hotel in West Virginia, located about 75 miles from Richwood. Christmas was then the general manager of The Wallace Corporation. At this time T. R. was advised that, due to the poor health of both Wallace and Christmas, the Wallaces desired to dispose of their interests in the business of petitioner, and he was invited to inspect petitioner's plant at Richwood. T. R. accepted the invitation and drove to Richwood with Christmas. He found that petitioner's operations were inefficient, and its clothespin machinery antiquated. The plant was being run by a Mrs. Weiss who in T. R.'s opinion did not understand modern production *333 methods. T. R. found that some of the clothespin lathes were at least 40 years old and that there had been no refinements or improvements made in them during their entire lives. In petitioner's plant it required two girls working on one machine to produce approximately 100 clothespins a minute, where-as in Forster's plant one girl on a machine could produce approximately 500 clothespins a minute. Wallace's labor costs were approximately 10 times as great as Forster's labor costs. Petitioner's dish machines were modern and could be operated efficiently; however, they were placed in an inefficient manner which required a great deal of manual handling of raw material and a larger number of personnel than would be necessary if they were better located. T. R. was interested in acquiring The Wallace Corporation for several reasons. T. R. was aware of the fact that petitioner was well known and respected throughout the trade in the whole country with trade or brand names having a consumer demand built up over a long period of years. Among its important customers was Sears Roebuck and Co. the account of which had been lost by Forster to petitioner some 10 years before. Petitioner had excellent *334 modern equipment for the manufacture of food trays. Petitioner also had in storage some toothpick manufacturing machinery which had been operated in a plant in Wisconsin some years before. T. R. was desirous of obtaining this equipment in order to keep it from falling into the hands of a competitor. The purchase of petitioner was desirable because it was well located in an area where there were available large supplies of hard wood at lower costs than were charged elsewhere. T. R. was also impressed by the fact that petitioner's plant was located in a neighborhood where there was available a skilled and nonunion labor supply. At about this time one competitor manufacturer of slotted clothspins had discontinued its production and another was about to do the same. T. R. believed that the lessening of competition increased the possibility of operating petitioner profitably and consequently the purchase of petitioner was more attractive to him. T. R. and other officers of Forster were interested in the purchase of the debenture notes of petitioner by Forster in order to facilitate the acquisition of the control of Wallace by T. R. because of their anticipation that it would provide Forster *335 with an additional outlet for sales of its toothpicks, plastic spoons and forks, and veneer products, to enable Forster salesmen to sell the food trays manufactured by The Wallace Corporation, and to enable Forster to discontinue the services of several commission agents and replace them with its own employees, who as salesmen of a full line of wooden ware and paper products would have sufficient business to cover their expenses and also earn a living. On this inspection tour T. R. was not shown any of petitioner's balance sheets and there was no discussion between T. R. and Christmas as to whether the company had an operating loss. At the conclusion of the inspection four T. R. advised Christmas that he was interested in acquiring petitioner and he requested that a meeting be set up with petitioner's owners at an early date. In December 1957 T. R. and his attorney met with Wallace and Christmas and their attorney in St. Louis for the purpose of making final negotiations for the purchase and sale of petitioner. The attorney representing T. R. was a specialist in taxation. At this meeting T. R. sought information pertaining to the volume of petitioner's sales broken down by items, *336 whether petitioner had any commitments which would have to be carried on, information on who petitioner's distributors were and the amount of commissions they received, and the volume of business petitioner did, especially with the Sears Roebuck and Co. account. T. R. inspected petitioner's financial records which revealed the company's losses in prior years. The most recent balance sheet available dated September 30, 1957, showed a deficit of $107,312.19 as follows: THE WALLACE CORPORATION
ST. LOUIS, MISSOURI
BALANCE SHEET AS AT SEPTEMBER 30, 1957
ASSETS
Current Assets: Cash in banks and on hand
$ 676.65
Accounts Receivable - Customers
117,135.81
Inventories: Raw Materials & Supplies
$ 52,946.65
In Process & Finished Goods
31,964.95
84,911.60
$202,724.06
Other Assets: Miscellaneous Accounts Receivable
$ 17,971.91
Cash Surrender Value Life Insurance
8,181.75
Cash Advances on Log Bids
11,602.66
Road Construction
192.50
$ 37,948.82
Plant and Equipment: Land
$ 5,050.00
Buildings
$ 54,044.98
Machinery & Equipment
249,087.15
$303,132.13
Less Reserve for Depreciation
221,883.78
81,248.35
$ 86,298.35
Deferred Charges - Unexpired Insurance
5,811.39
$332,782.62
LIABILITIES
Current Liabilities: Accounts Payable
$ 41,586.66
Accrued Salaries, Wages & Expense
11,560.19
Accrued and Withheld Taxes
6,947.96
$ 60,094.81
Income Debentures Notes Payable - Due
280,000.00
Nov. 1, 1965
Capital Stock - Par Value $1.00
100,000.00
Outstanding & Authorized - 100,000
Shares
Deficit: Balance July 1, 1957
$115,197.66
Net Profit for the 3 months ended
7,885.47
9/30/57
Balance September 30, 1957
$107,312.19
$332,782.62
*337 Although there was some fluctuation in petitioner's assets and liabilities between September 30, 1957, and January 3, 1958, petitioner's overall financial condition remained substantially unchanged during this period. The prices of the debentures and common stock purchased were arrived at from actual values placed on all the equipment, the amount of cash that was in the bank, the receivables, and the inventory. T. R. personally checked all these items. Petitioner's operating loss available as a deduction in future years was not mentioned or discussed during the negotiations between the parties although T. R. was aware of its existence. The book value of the finished goods inventory was approximately 50 percent of its actual market value. This factor was taken into consideration in arriving at the purchase price. The ultimate purchase prices of $280,000 for the debentures and $22,500 for the common stock were arrived at in an arm's-length transaction. T. R. and Frances, the operating team of Forster, purchased the stock out of their own funds in order to assure the trustees of the Hodgkins Trust and the directors of Forster, who were responsible for the purchase of the debentures, *338 that they would take a continued personal interest in the operation of petitioner's business. After the meeting with the Wallaces in December 1957 in St. Louis, T. R. went to Richwood, West Virginia, to check on the representations that had been made to him, the values that had been assigned to the various assets, and the availability of lumber from forest ranges owned by the Federal Government. T. R. satisfied himself that the representations made by the Wallaces were accurate and that the forest rangers were expected to offer for sale approximately nine million feet of lumber per year for a period of 5 years ending in 1962. Thereupon T. R. returned to St. Louis and on January 3, 1958, the transaction was consummated in which T. R. and Frances purchased petitioner's stock and Forster purchased petitioner's debentures. T. R. and Frances had previously acquired other corporations which they have built into modern, profitable businesses. Based on their past experience, T. R. believed that petitioner was a good business investment and that it could be made to operate profitably. After the purchase of petitioner's stock and debentures, T. R. summoned Forster's assistant treasurer, *339 works manager, and chief engineer to meet him at petitioner's plant in Richwood. T. R. and this team spent approximately 10 days in Richwood in realigning petitioner's operations and making plans for petitioner's future operations. Prior to January 3, 1958, petitioner manufactured, packaged, and sold its own clothespins and food trays. It purchased toothpicks from the Diamond Match Company and boxed and distributed them under its own labels. Subsequent to the change in petitioner's ownership, letters dated January 4, 1958, were sent to petitioner's principal customers outlining the change in ownership. The letters were sent by petitioner's general manager, H. L. Bartley, who prior to January 3, 1958, had been employed as petitioner's sales manager. Prior to the transfer petitioner's offices were located in Wallace's pencil factory in St. Louis. It was necessary to move petitioner's offices after the change in ownership. The accounting offices were moved to Richwood. The accounting procedures were reviewed and a girl who was working in the Richwood office was assigned to handle all accounting matters for petitioner. The sales promotion office was moved to Bartley's home in Kirkwood, *340 a suburb of St. Louis, Missouri. Later in January 1958 petitioner's sales office was moved to space in Forster's office in Farmington, Maine. Mrs. Weiss was removed as petitioner's plant manager for the reason that T. R. did not think she would be helpful in carrying out his intention to modernize the plant. A foreman, McElwee, was made plant manager in Mrs. Weiss' place. T. R. closed the office which was located in a building adjacent to the plant and located the office in the plant building itself by putting up partitions and by putting in gas heat, new lighting fixtures, and telephones. T. R. and his team of advisers from Forster decided to continue and increase the capacity of petitioner's production of food trays. The food-tray machines were relocated so that one operator could operate more than one machine and also so that the machines were closer to the cardboard which was the raw product used in the machines. Plans were made for future installation of additional machines to manufacture various sizes of paper dishes in order to give petitioner a full line to sell. It was decided to terminate the manufacture of clothespins until such time as new machinery could be constructed *341 for installation in petitioner's plant so that an efficient and profitable operation could be carried on. The toothpick operation was to continue as before, except that toothpicks were to be purchased from Forster rather than from Diamond Match Company. Diamond Match Company and Forster are competitors in the manufacture and sale of toothpicks. The use of the space in the warehouse was reorganized so that finished goods could be moved in and out more efficiently. Sixteen new machines for the manufacture of high- and low-wall food trays were installed as quickly as they could be built. These were operated along with the foodtray manufacturing machines that were in petitioner's plant on the date of the transfer of ownership until 1962. Prior to the transfer of ownership the toothpicks which petitioner acquired from the Diamond Match Company were packaged by hand by petitioner at its Richwood plant and then shipped and distributed to petitioner's customers. Subsequent to the change in ownership, petitioner purchased packaged toothpicks from Forster and Forster shipped them from Maine to petitioner's customers. Forster also manufactured, packaged, and shipped clothespins sold to *342 petitioner's customers. The clothespins and toothpicks were sold under the brand names used by petitioner prior to the change of ownership. The entire operation with respect to the manufacture and sale of clothespins had previously taken place at petitioner's plant in Richwood prior to the change in ownership. Forster used automatic packing machines for clothespins, whereas petitioner packed them by hand. Petitioner continued purchases of lumber from two Government lots until the contracts to do so were completed in 1960. The obligation to purchase the lumber was incurred prior to the transfer of ownership on January 3, 1958. The trade names used by The Wallace Corporation for the products sold by it prior to the transfer of ownership were Blue Ridge, Acme, Boss, Ivripic, Nushape, and Grip-Rite. These were well known brand names and have been continued in use after the transfer of ownership. During the initial 10 days under the new ownership arrangements were made to have an insurance company make a reappraisal of petitioner's manufacturing plant to determine a fair insurance value of the property with the machinery intended to be discarded eliminated from such valuation. An *343 inspection of petitioner's assets resulted in the discovery of the maintenance supplies inventory, which was not included on petitioner's balance sheet dated September 30, 1957. The Wallace family inventoried these items and valued them at approximately $14,000, but they failed to include these items on the balance sheet. T. R. was successful in obtaining for petitioner a reduction in local taxes in Richwood which was granted as an incentive to continue operations in Richwood. A new contract was also negotiated with a power company to cover petitioner's reduced demand for power. At the time of the transfer of ownership T. R. and his team of advisers planned, with respect to the clothespin operation, to run out the work in process and cease the manufacture of clothespins for approximately a year to a year and a half when new equipment would be ready and installed in petitioner's plant. On January 28, 1958, petitioner placed an order with J. W. Penney & Sons Co., Mechanic Falls, Maine, to prepare new drawings for a clothespin manufacturing machine which was to incorporate certain refinements and improvements over earlier designs. Forster held the patents on the design of the machines. *344 It was first planned that petitioner would build its own machines from the drawings. It was later decided, however, that it would be more economical for both petitioner and Forster if Forster built the machines from its own drawings. As the first machine became available, it would replace an older operating machine in Forster's plant. In this way there would be no curtailment in production. The operations in Richwood. A new contract was also negotiated with a power company to cover petitioner's reduced demand for power. At the time of the transfer of ownership T. R. and his team of advisers planned, with respect to the clothespin operation, to run out the work in process and cease the manufacture of clothespins for approximately a year to a year and a half when new equipment would be ready and installed in petitioner's plant. On January 28, 1958, petitioner placed an order with J. W. Penney & Sons Co., Mechanic Falls, Maine, to prepare new drawings for a clothespin manufacturing machine which was to incorporate certain refinements and improvements over earlier designs. Forster held the patents on the design of the machines. It was first planned that petitioner would build its own *345 machines from the drawings. It was later decided, however, that it would be more economical for both petitioner and Forster if Forster built the machines from its own drawings. As the first machine became available, it would replace an older operating machine in Forster's plant. In this way there would be no curtailment in production. The replaced machine was then to be overhauled. All of the new improvements and refinements would be incorporated into the old machine so that it would be as efficient as a new machine. The rebuilt machine would then be shipped to Richwood and put into operation there. It was expected that there would be three machines at Richwood and three at Forster's plant, and one extra machine which could be used at either place in an emergency. It had not been decided whether petitioner would buy or lease the machines from Forster. Several changes in the design of the machines delayed their ultimate construction. It was not until June 1, 1959, that Forster ordered a clothespin machine from J. W. Penney & Sons Co. On or about July 22, 1959, the order was changed from one clothespin machine to four. The first of the four clothespin machines ordered by Forster was *346 delivered in the spring of 1960, and the others were delivered and installed in Forster's plant soon thereafter. Forster expended $2,529.35 for preparation of the drawings for the new machines, and $27,081.17 for the construction of the four machines. Beginning in January 1958 through the spring of 1960 the sales of standard or slotted clothespins by Wallace and Forster, as well as the clothespin industry as a whole, declined due to an increase in the sale of driers and an increase in the sale of imported clothespins selling at a cheaper price. The officers of petitioner therefore decided to delay the installation of the renovated machines in petitioner's plant until there was an increase int he market for the clothespins. The machines were renovated but they have never been used. At the time of trial herein the machines were still in storage in Forster's plant at Mattawamkeag, Maine. Although petitioner's sales of standard or slotted clothespins declined, its dollar volume of total sales (including spring pins) increased during the fiscal years in issue here and the succeeding fiscal years as follows: WALLACE CORPORATION SALES
Fiscal Year
Clothes-
Spring-
Tooth-
Paper
Other
Ended June
pins
pins
picks
Dishes
Plasties
Items
Total Sales
30
1958
$418,632
$239,822
$55,846
$247,794
$ 9,761
$13,666
$ 985,524
1959
366,373
277,762
77,158
240,615
13,786
59,396
1,035,093
1960
329,162
299,665
79,233
282,669
11,208
87,778
1,089,718
1961
242,756
277,997
91,909
397,242
11,075
29,848
1,050,830
1962
241,087
316,723
114,006
593,199
11,421
11,128
1,287,567
*347 Petitioner acquired its clothespins and toothpicks from Forster at substantially lower prices than Forster was charging to its customers. However, the record indicates that the prices paid to Forster by petitioner for toothpicks were greater appreciably than those previously paid by petitioner to Diamond Match Company, plus direct labor costs incurred by petitioner in the packaging and sale of toothpicks. By purchasing clothespins from Forster petitioner eliminated its own manufacturing costs. Petitioner resold the clothespins and toothpicks at the same prices Forster was charging. The following schedule indicates the total purchases of clothespins from Forster by Wallace and others, and the total sales of clothespins by Forster and Wallace during the taxable years ended June 30, 1958, and June 30, 1959: Fiscal
Total Purchases
Total Purchases
Total Sales
Total Sales
Year Ended
by Wallace from
by Others from
by
by
June 30
Forster
Forster
Forster
Wallace
1958
$156,746.86
$2,442,141.21
$2,598,888.07
$658,455.22
1959
369,416.34
2,814,868.62
3,184,284.96
644,135.92
The following schedule indicates the total purchases of toothpicks from *348 Forster by Wallace and others and the total sales of toothpicks by Forster and Wallace during the taxable years ended June 30, 1958, and June 30, 1959: Fiscal
Total Purchases
Total Purchases
Total Sales
Total Sales
Year Ended
by Wallace from
by Others from
by
by
June 30
Forster
Forster
Forster
Wallace
1958
$ 16,126.31
$1,780,011.05
$1,796,137.36
$ 55,846.84
1959
40,228.28
1,830,824.53
1,871,052.81
77,158.97
Wallace sold food trays to Forster at the same prices it charged other customers. Forster resold the food trays at the same prices charged by Wallace to others. Forster made no gain on food trays except for a 10 percent commission it received from Wallace on each sale made. The following schedule shows the total sales of food trays by petitioner to Forster and others, and the total sales by Forster during the fiscal years ended June 30, 1958, and June 30, 1959: Fiscal Year
Total Sales by
Total Sales by
Total Sales
Ended June 30
Wallace to Forster
Wallace to Others
by Forster
1958
No Sales
$247,794.72
No Sales
1959
$68,269.49
172,345.52
$68,269.49
The following schedule shows the sales, purchases, *349 direct labor costs, and number of employees of petitioner during the fiscal years ended June 30, 1956, through June 30, 1959: Taxable Year Ended
6/30/56
6/30/57
6/30/58
6/30/59
Sales: Clothespins
$709,199.93
$724,382.12
$658,455.22
$644,135.92
Paper Trays
261,612.14
244,807.76
247,794.72
240,615.01
Toothpicks
50,685.55
49,890.71
55,846.84
77,158.97
Purchases: Clothespins
0
0
156,746.86
369,416.34
Toothpicks
19,293.80
14,674.70
23,902.87 [1]
40,228.28
Direct Labor: Clothespins
239,060.34
238,753.95
141,299.51
0
Paper Trays
20,922.14
17,802.61
15,390.95
11,071.52
Toothpicks
6,482.89
6,807.79
3,753.83
0
Number of Employees: March 15
141
142
9
11
June 15
123
148
12
12
September 15
125
146
9
12
December 15
136
109
9
12
The decrease in number of employees from over 100 in number prior to the change in ownership to 12 and under after the change in ownership was primarily due to the stopping of the manufacture of clothespins. Prior to the change in ownership, petitioner shipped its products to distributors who had their own *350 warehouses. After the change in ownership, petitioner continued to use substantially the same distributors, and also used the public warehouses throughout the country that Forster had been using. The use of public warehouses enabled petitioner to ship larger volumes of merchandise in bulk and thereby obtain lower freight rates. At a public warehouse the merchandise is separated into the various quantities ordered by the customers and then distributed to the various customers. Although petitioner's products were shipped in the same cars and trucks with Forster's products, petitioner sent separate loading tickets to the warehouses and all charges for freight, handling, and storage were billed to petitioner. Petitioner continued to serve the same customers and also some new customers after the change in ownership. On January 20, 1958, the president of the Richwood Lions Club wrote to T. R. setting forth his organization's interest in purchasing the building formerly used by petitioner as an office building. T. R. responded that the office building was not for sale because it was expected that petitioner's equipment would be modernized and that the entire Richwood plant would be put *351 back into full operation. At that time the office building would be needed. Petitioner advised Dun & Bradstreet, Inc., and the Lumbermen's Credit Association, Inc., that subsequent to the change in ownership petitioner continued to manufacture food trays, that petitioner continued to sell toothpicks under its brand names, that petitioner's accounting office was located in Richwood, West Virginia, and that the sales office was located in Farmington, Maine, and that the manufacture of clothespins had been suspended for approximately 1 year or more until new modern equipment could be designed, built, and installed at Richwood. On November 18, 1959, petitioner's plant manager wrote to T. R. suggesting a revision in the layout of the food-tray machines in Richwood which would allow for the installation of new machines, if needed. T. R. approved the plant manager's recommendations. In the summer of 1960 Forster had laid the foundation and had begun construction of a new office building in East Wilton, Maine, to alleviate the crowded conditions in a rented building in Farmington, Maine. At that time T. R. learned that a woolen mill in Wilton, Maine, was for sale at a low price. The woolen *352 mill, which had approximately 250,000 square feet of floor space, was purchased in October 1960 and the work was stopped on the construction of the new office building. Forster moved into the new building its warehouse and spring-pin assembly department which were in rented buildings in Portland, Maine. Several of Forster's wholly owned subsidiaries were moved into the building. In January 1961 petitioner's management began to move machines of its food-tray department to the new plant in Wilton, Maine. The move was completed sometime in 1962 and the Richwood plant was then closed down completely. Petitioner's difficulty in shipping merchandise to its customers from Richwood was one of the reasons resulting in the move to Wilton, Maine. The railroad servicing petitioner in Richwood was a dead-end spur line. It was necessary that petitioner's rail shipments first be moved to Clarksburg, West Virginia, and from this terminal point to destinations in the west and south. This rail service caused delays in the delivery of merchandise to petitioner's customers. Petitioner therefore shipped its goods by truck which was more costly than by rail. By moving to Maine petitioner was able to ship *353 its merchandise to its customers along with Forster's merchandise being shipped to the same destinations. Petitioner's goods were delivered in generally shorter periods of time than from Richwood and generally at lower freight rates. The Richwood Development Company, which was organized to develop industry and employment in Richwood, contacted petitioner in 1961 relative to the purchase of the Richwood plant. At that time petitioner's officers advised the Richwood Development Company that no decision had been made as to petitioner's future plans for the Richwood plant, and that the plant was not for sale. However, in the early part of 1962, petitioner decided to sell the Richwood plant. An option to purchase the property was granted to the Richwood Development Company, and it purchased the property from petitioner in July 1962. Prior to the early part of 1962 petitioner's plant at Richwood had never been listed or offered for sale. During the period from January 3, 1958, to June 30, 1959, petitioner continued to carry on a trade or business substantially the same as that conducted before this period. Control of petitioner by T. R. Hodgkins and related parties was not acquired *354 for the principal purpose of evasion or avoidance of Federal income tax by securing the benefit of net operating loss carryover deductions which they would not otherwise enjoy. Opinion KERN, Judge: The sole issue presented for our decision is whether the petitioner in computing taxable income from the operation of the business conducted by it in the fiscal years ended June 30, 1958, and June 30, 1959, may deduct, pursuant to section 172 of the Internal Revenue Code of 1954, [1] net losses sustained in the fiscal years ended June 30, 1953, and June 30, 1955, through June 30, 1957. *355 Respondent contends that the claimed deductions must be disallowed pursuant to sections 172 and 382(a)[2] due to the change in the ownership of petitioner's stock that occurred on January 3, 1958, and because petitioner "has not continued to carry on a trade or business substantially the same as that conducted before any change in the * * * ownership" of petitioner's stock. Respondent further contends that the claimed deductions are barred by setion 269 [3] because the new owners acquired control of petitioner for the principal purpose of avoiding Federal income tax by securing the benefit of the net operating loss carryover deductions which they would not otherwise enjoy. Respondent argues that the consideration paid upon acquiring petitioner was substantially less than the aggregate of the adjusted basis of petitioner's property and the tax benefits not available otherwise than as a result of such acquisition. Respondent relies upon such fact, pursuant to section 269(c), as prima facie evidence of such principal purpose of evasion or avoidance of Federal income tax. *356 It is contended on behalf of petitioner that petitioner continued to be engaged in substantially the same trade or business after the stock ownership change on January 3, 1958, as it had before such sale and, consequently, it is entitled to use the net operating loss carryovers available for the fiscal years ended June 30, 1958, and June 30, 1959. Petitioner also argues that the control of petitioner was acquired for bona fide business reasons and not for the principal purpose of the evasion or avoidance of Federal income tax by securing the benefit of a deduction not otherwise available. We agree with petitioner that following the purchase of petitioner's stock on January 3, 1958, it continued to be engaged in substantially the same trade or business as that carried on prior to such transfer. Respondent relies on Libson Shops, Inc., v. Koehler, 353 U.S. 382. In that case sixteen sales corporations were merged with the taxpayer, a management corporation. The outstanding stock of all seventeen corporations was owned by the same interests. New shares of petitioner's stock were issued pro rata in exchange for the stock of the sales corporations. The effect of the merger *357 was to convert seventeen businesses, reporting their incomes separately, into a single enterprise filing one income tax return. Prior to the merger, three of the sales corporations had net operating losses. Each of the retail units formerly operated by these three corporations sustained a net operating loss in the year following the merger. In its income tax return for the first year after the merger the surviving corporation claimed deductions for the premerger operating losses of these three corporations pursuant to sections 23(s) and 122 of the Internal Revenue Code of 1939. In disallowing the claimed deductions the Supreme Court stated in pertinent part: The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year [5] There is, however, no indication in their legislative *358 history that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which had been operated and taxed separately before the merger. What history there is suggests that Congress primarily was concerned with the fluctuating income of a single business. [6]
* * *
We conclude that petitioner is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses. n9 [Footnotes omitted.] Respondent also relies on section 382(a) which provides for limitations on net operating loss carryovers when certain changes in a corporation's stockownership occur and the corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the stockownership. There is no dispute in the instant case that the conditions of section 382 which relate to the change in stockownership have been met. We need only consider whether petitioner "continued to carry on a trade or business substantially the same as that conducted before" the change in ownership. That question *359 and the question raised by respondent with regard to the application of the doctrine of Libson Shops, Inc. v. Koehler, supra, to the proper interpretation of section 172 involve similar considerations and therefore will be dealt with together. Unlike section 269, pursuant to which deductions for net operating loss carryovers are not allowable when the principal purpose for the acquisition of the stock of a "loss" corporation was to secure the benefit of a deduction which would not otherwise be enjoyed, the prohibition against the use of loss carryovers pursuant to section 382(a) is not dependent upon purpose or intent. [4]Goodwyn Crockery Co., 37 T.C. 355, affd. 315 F. 2d 110. The fact, if it be a fact, that the new owners of petitioner's stock contemplated, during the taxable years, the possibility of changing petitioner's business at some indefinite future time without taking any steps during the taxable years to accomplish such change is not relevant to the question of whether this section is applicable to the instant case. *360 In deciding whether or not petitioner has continued to carry on a trade or business substantially the same as that conducted before any change in stockhownership, we must consider as pertinent factors whether "the corporation shifts from one type of business to another, discontinues any except a minor portion of its business, changes its location, or otherwise fails to carry on substantially the same trade or business * * *." S. Rept. No. 1622, 83d Cong., 2d Sess., p. 285 (1954). Whether or not a corporation has continued to carry on substantially the same business so that it may carry over net operating losses is a factual issue to be determined upon the particular facts in each case. See Federal Cement Tile Co., 40 T.C. 1028. Upon careful consideration of all the evidence in this case we have found as a fact that petitioner has continued to carry on substantially the same business following its change in stockownership. Prior to the change in stockownership, petitioner was engaged in the manufacture and/or sale of clothespins, paper trays, and toothpicks. Following the change in stockownership, petitioner continued in substantially the same business. Petitioner *361 continued to market its products under its own brand names, to its own customers, and through many of the same sales representatives. The fact that petitioner expended its volume of paper trays manufactured and sold does not connote a change in business. See Julius Garfinckel & Co., 40 T.C. 870, 877; on appeal (C.A. 2, Nov. 15, 1963). The fact that petitioner discontinued purchasing its toothpicks from the Diamond Match Company and after the change in stockownership obtained them from Forster did not change petitioner's business of selling toothpicks under its own brand names. The fact that petitioner ceased to manufacture clothespins does not establish that petitioner's business was substantially changed. This part of petitioner's operation was intended to be only temporarily halted during the years here in issue while new clothespin manufacturing machines were being prepared for petitioner's use to replace its antiquated machines. During this time petitioner carried on its business of selling clothespins obtained from Forster under its own brand names and to its own customers. Respondent argues that petitioner obtained its clothespins and toothpicks at substantially *362 lower prices than those which Forster was charging to its regular customers, and that this was part of a scheme to integrate Forster's taxable income with petitioner's net operating loss carryovers. The record indicates that petitioner's sales of clothespins and toothpicks were made to its own established customers and that Forster did not divert to petitioner any of its own retail business or surrender to petitioner any profits which it could have made from others. In view of the diversity of the ownership of the stock of petitioner and of Forster (all of the stock of Forster being held by a trust established for the benefit of the children and grandchildren of T.R. and Frances and approximately 55 percent of petitioner's stock being held by Virginia, T.R.'s second wife), it would not be likely that either corporation would be exploited for the benefit of the other. At the most, we might expect a cooperation not costly to either resulting from the common management of T.R. There is no evidence of record which would indicate that Forster sold to petitioner at prices below its cost. There is evidence of record stipulated by the parties which shows that petitioner acquired clothespins *363 from Forster at a cost slightly in excess of what it would have cost petitioner to manufacture them, and that the prices of the toothpicks bought by petitioner from Forster were approximately the same as those charged by the Diamond Match Company, and perhaps a little higher, all of which indicates that petitioner paid reasonable prices for its purchases from Forster. Therefore, we cannot agree with respondent's contention that petitioner's claimed deductions constitute an attempt to offset its prior losses against income which might have been Forster's but which was deliberately diverted to petitioner. Nor are we of the opinion that the purchase of toothpicks by petitioner from Forster instead of from the Diamond Match Company and the purchase of clothespins on what was considered to be a temporary basis, at prices approximately equal to or slightly greater than its own cost of manufacturing them, constituted a substantial change in petitioner's business. Inasmuch as petitioner has continued after its change in stockownership to be engaged in substantially the same business as that carried on prior to such change in stockownership, petitioner is entitled to the claimed net operating *364 loss carryover deductions. Goodwyn Crockery Co., supra; Kolker Bros., Inc., 35 T.C. 299. [6] The facts of the instant case are even stronger for the taxpayer than those appearing in Goodwyn Crockery Co. In that case, the taxpayer added a "dry goods" inventory to its business following the change in ownership. It handled a "hard goods" inventory exclusively before such change in ownership. It moved its principal place of business from Memphis, Tennessee, to Cairo, Illinois. The taxpayer in that case also commenced operation of retail stores whereas prior to the change in ownership it was engaged in wholesale trade exclusively. Notwithstanding these changes and others, we found that the basic character of the taxpayer's business remained unchanged and that there was no shift from one business to another business. A fortiori, in the instant case, where the petitioner continued to sell the same goods to the same customers following its change in ownership, there was no change in the basic character of petitioner's business and it did not shift from one business to another business. While there were changes in the ways and means by which petitioner operated *365 its business, it is our opinion that the business itself remained substantially the same. Several cases relied upon by respondent which have interpreted the Libson Shops opinion differ so radically on their facts from the instant case that they are not only distinguishable but, indeed, point to a conclusion in this case different from that urged by respondent and emphasize the essential similarity of this case to the cases of Goodwyn Crockery Co. and Kolker Bros., Inc., supra. They involve the mergers of successful but radically different business enterprises with "shell" corporations having accumulated net operating losses, or corporations which have operated an old business at a loss, have changed their business after a change of ownership of the corporation, and have sought to offset the losses from the old business against their income from the new and profitable enterprises, or cases in which *366 there was a general lack of business continuity between the loss and gain years. See Arthur T. Beckett, 41 T.C. - (Dec. 20, 1963), (in which it was held that net operating losses incurred in the retail hardware business of a corporation could not be carried over and deducted from the income of a real estate development business of the corporation subsequently entered into and conducted by the purchasers of the corporation's preferred stock who received most of the profits from the real estate development business); Fawn Fashions, Inc., 41 T.C. - (Nov. 15, 1963), (in which it was held that accumulated losses of a corporation which remained inactive for about 2 years could not be offset against income of a business transferred to the corporation by purchasers of the petitioner's stock); Federal Cement Title Co., supra, (in which it was held that premerger losses from a cement tile roofing business carried on in states on or near the East Coast could not be offset against the postmerger income of a cement tile, roofing business conducted in the Midwest); Julius Garfinckel & Co., supra, (in which it was held that the premerger losses of a corporation selling *367 clothing at retail were not deductible against postmerger income resulting solely from the profits of a separate business enterprise also selling clothing at retail); Huyler's, 38 T.C. 773, on appeal (C.A. 7, May 16, 1963), (in which it was held that losses from the candymaking and restaurant business formerly carried on by the corporation could not be offset after a change in the ownership of the corporation against income from the new business of manufacturing aluminum and other metal products); Frank Spingolo Warehouse Co., 37 T.C. 1, (in which it was held that net operating losses incurred in the refrigeration and air conditioning business could not be offset against the income from a successful trucking business transferred to the corporation by its new owner); J. G. Dudley Co., 36 T.C. 1122, affd. 298 F. 2d 750, (in which it was held that losses incurred by a corporation in the business of manufacturing hosiery could not be carried over and offset against the income from the business of electrical heating, plumbing, contracting, and related types of work carried on by the corporation after the change in its ownership); *368 Norden-Ketay Corporation v. Commissioner, 319 F. 2d 902, affirming a Memorandum Opinion of this Court, (in which it was held that losses resulting from the business of mining coal could not be offset, after a change in the ownership of the corporation, against income resulting from the new business of manufacturing and selling electronic equipment); Brown Dynalube Company v. Commissioner, 297 F. 2d 915, affirming a Memorandum Opinion of this Court, (in which it was held that losses suffered by a corporation while acting as an agent for the sale of lubricating devices could not be carried over and deducted from profits earned by it in later years in the leasing of automatic packing machines after control of the corporation passed into different hands); Commissioner v. Virginia Metal Products, Inc., 290 F. 2d 675, reversing 33 T.C. 788, certiorari denied 368 U.S. 889, (in which it was held that accumulated losses of a corporation resulting from the business of making aluminum storm windows and doors and selling and servicing automatic furnace stokers could not be offset against the income from a new business of manufacturing *369 and selling steel products carried on in the old corporate "shell" by the new owners of the stock in the corporation). Respondent also contends that the principal purpose for which control of petitioner was acquired was evasion or avoidance of tax by securing the benefit of deductions which would not otherwise be enjoyed, and that for this reason the claimed deductions should be disallowed pursuant to section 269(a). In addition to the usual presumption of correctness afforded respondent's determinations, respondent relies on section 269(c) and the regulations thereunder which provide that the fact that the consideration paid upon acquiring a corporation is substantially disproportionate [6] to the aggregate of the adjusted basis of the property of the corporation and of the tax benefits not available to such person or corporation otherwise than as a result of such acquisition shall be prima facie evidence of the principal purpose of evasion or avoidance of tax. accumulated losses of a corporation resulting from the business of making aluminum storm windows and doors and selling and servicing automatic furnace stokers could not be offset against the income from a new business of manufacturing *370 and selling steel products carried on in the old corporate "shell" by the new owners of the stock in the corporation). Respondent also contends that the principal purpose for which control of petitioner was acquired was evasion or avoidance of tax by securing the benefit of deductions which would not otherwise be enjoyed, and that for this reason the claimed deductions should be disallowed pursuant to section 269(a). In addition to the usual presumption of correctness afforded respondent's determinations, respondent relies on section 269(c) and the regulations thereunder which provide that the fact that the consideration paid upon acquiring a corporation is substantially disproportionate [6] to the aggregate of the adjusted basis of the property of the corporation and of the tax benefits not available to such person or corporation otherwise than as a result of such acquisition shall be prima facie evidence of the principal purpose of evasion or avoidance of tax. *371 Section 269(c) is a procedural device for the determination of whether the principal purpose of the corporate acquisition was tax avoidance or evasion. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 228 (1954). Petitioner contends that its control was acquired for a bona fide business purpose and not the interdicted purposes of section 269(a), and that the presumption afforded respondent by section 269(c) is rebutted by the evidence of record. We have found that control of petitioner was acquired for bona fide business purposes and therefore section 269(a) does not bar the claimed net operating loss carryover deductions. Assuming that section 269(c) is applicable to this case, [7] we hold that the petitioner has successfully borne the burden of going forward with evidence and the burden of persuasion, and have concluded that the principal purpose of the acquisition was not tax avoidance and that the presumption is rebutted. See Baton Rouge Supply Co., 36 T.C. 1. *372 To allow for certain determinations made by respondent to which petitioner has not assigned error. Decision will be entered under Rule 50. Footnotes
1. In petitioner's brief it is stated that Virginia Graef Hodgkins is T. R.'s second wife.↩
1. Includes purchases from Forster totaling $16,121.31.↩
1. All section references are to the sections of the Internal Revenue Code of 1954 in effect during the years here involved, unless otherwise noted. SEC. 172. NET OPERATING LOSS DEDUCTION. (a) Deduction Allowed - There shall be allowed as a deduction for the taxable year an amount equal to the agregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. * * * (b) Net Operating Loss Carrybacks and Carryovers. - (1) Years to which loss may be carried. - A net operating loss for any taxable year ending after December 31, 1953, shall be - * * *
(B) a net operating loss carryover to each of the 5 taxable years following the taxable year of such loss. * * *
(g) Special Transitional Rules. - (1) Losses for taxable years ending before January 1, 1954. - For purposes of this section, the determination of the taxable years ending after December 31, 1953, to which a net operating loss for any taxable year ending before January 1, 1954, may be carried shall be made under the Internal Revenue Code of 1939. * * *
Section 122(b)(2)(B) of the 1939 Code provides in part: * * *
(B) Loss for Taxable Year Beginning After 1949. - If for any taxable year beginning after December 31, 1949, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the five succeeding taxable years * * *.↩
2. SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS. (a) Purchase of a Corporation and Change in Its Trade or Business. - (1) In general. - If, at the end of a taxable year of a corporation - (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at - (i) the beginning of such taxable year, or (ii) the beginning of the prior taxable year, (B) the increase in percentage points at the end of such taxable year is attributable to - (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or (ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, (1) In general. - If, at the end of a taxable year of a corporation - (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at - (i) the beginning of such taxable year, or (ii) the beginning of the prior taxable year, (B) the increase in percentage points at the end of such taxable year is attributable to - (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or (ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years. (2) Description of person or persons. - The person or persons referred to in paragraph (1) shall be the 10 persons (or such lesser number as there are persons owning the outstanding stock at the end of such taxable year) who own the greatest percentage of the fair market value of such stock at the end of such taxable year; except that, if any other person owns the same percentage of such stock at such time as is owned by one of the 10 persons, such person shall also be included. If any of the persons are so related that such stock owned by one is attributed to the other under the rules specified in paragraph (3), such persons shall be considered as only one person solely for the purpose of selecting the 10 persons (more or less) who own the greatest percentage of the fair market value of such outstanding stock. (3) Attribution of ownership. - Section 318 (relating to constructive ownership of stock) shall apply in determining the ownership of stock, except that section 318(a)(2)(C) shall be applied without regard to the 50 percent limitation contained therein. (4) Definition of purchase. - For purposes of this subsection, the term "purchase" means the acquisition of stock, the basis of which is determined solely by reference to its cost to the holder thereof, in a transaction from a person or persons other than the person or persons the ownership of whose stock would be attributed to the holder by application of paragraph (3). ↩
3. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. * * *
(c) Presumption in Case of Disproportionate Purchase Price. - The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate - (1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and (2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition, shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.↩
5. Kolker Bros., Inc., 35 T.C. 299↩, is applicable only insofar as it holds that the taxpayer in that case was entitled to the net operating loss deductions because its business, subsequent to its change in stockownership, remained substantially unchanged.
6. "Disproportionate" has been interpreted to mean "less than." S. Rept. No. 1622, 83d Cong., 2d Sess., p. 228 (1954). It may be queried whether the interdicted purpose of section 269↩ might not be more logically presumed in a case where the consideration paid was greater than the net asset value or approximately equal to the value of the assets of the acquired corporation less its liabilities plus the value (if it ean be ascertained) of the available tax benefits. See Surrey and Warren, Federal Income Taxation 1596 (1960 ed.).
4. H. Rep. No. 1337, 83d Cong., 2d Sess., p. 42 (1954), states in part as follows: This special limitation [section 382] on net operating loss carryovers provides an objective standard governing the availability of a major tax benefit which has been abused through trafficking in corporations with operating loss carryovers, the tax benefits of which are exploited by persons other than those who incurred the loss. * * * S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 53, 284 (1954), states in part as follows: Under present law where a controlling interest in a corporation is acquired for the purpose of avoiding or evading tax liabilities the Internal Revenue Service may disallow the benefits of a deduction, credit, or allowance which would otherwise be enjoyed by the acquiring person or corporation. This provision has proved ineffectual, however, because of the necessity of proving that tax avoidance was the primary purpose of the transaction. It has also been so uncertain in its effects as to place a premium on litigation and a damper on valid business transactions. * * *
The section [section 382] now provides, generally, that if 50 percent or more of a corporation's stock changes ownership during a 2-year period as the result of a purchase or redemption of stock, and if the corporation changes its trade or business, then any net operating loss carryovers will be entirely eliminated. * * * * * *↩
7. The evidence indicates that the September 30, 1957, balance sheet of Wallace understated the value of "In Process & Finished Goods" inventory by 50 percent and omitted the maintenance supplies inventory valued at approximately $14,000.↩